*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 14-CV-431

STEPHEN M. SULLIVAN, APPELLANT,

v.

ABOVENET COMMUNICATIONS, INC., APPELLEE.

Appeal from the Superior Court of the
District of Columbia
Civil Division
(CAB-2045-12)

(Hon. Laura A. Cordero, Trial Judge)

(Argued February 24, 2015                         Decided March 26, 2015)

*Gregory S. Smith*, with whom *Lawrence S. Lapidus* was on the brief, for appellant.

*Robert B. Hetherington*, with whom *Amy Leete Leone* was on the brief, for appellee.

Before BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*, and KING, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:  Appellant Stephen Sullivan filed a negligence action against appellee AboveNet Communications, Inc. ("AboveNet") and the District of Columbia ("District"), alleging that he sustained serious injuries after he lost his footing on the uneven surface surrounding a manhole cover that

was installed by AboveNet. The jury concluded that the District was not negligent, but rendered a verdict against AboveNet and awarded Sullivan $300,000 in damages.[1] Notwithstanding the jury's award to Sullivan, the trial court thereafter granted AboveNet's pending motion for judgment as a matter of law made at the close of Sullivan's case[2] because it concluded that Sullivan failed to establish: (1) AboveNet was responsible for the condition; (2) AboveNet had constructive notice of the defect; and (3) the appropriate standard of care for restoring road surfaces after construction. Each failure individually was fatal to Sullivan's claim of negligence.

Based on the forthcoming reasons, we hold to the contrary that Sullivan presented enough evidence to allow a jury to decide whether AboveNet was negligent in failing to keep the area surrounding the manhole cover level, and therefore reverse the trial court's decision granting AboveNet's motion for judgment as a matter of law. Accordingly, on remand, the trial court is to reinstate the jury verdict and award.

---

[1] Sullivan filed suit against the District for its failure to monitor and inspect AboveNet's work. However, the jury rendered a verdict in the District's favor, and Sullivan does not challenge that decision on appeal.

[2] *See* Super. Ct. Civ. R. 50 (a).

# I. Factual Background

At approximately 4:55 p.m. on March 4, 2009, Sullivan left his place of work located at 50 F Street, Northwest, Washington, D.C. and took his normal route home by heading eastbound toward North Capitol Street for Union Station. He stopped at the intersection point between F Street, North Capitol Street, and Massachusetts Avenue, and waited for the crosswalk sign to change. As he proceeded to cross the intersection, Sullivan felt his right foot "catch on something." As he stumbled to balance himself, his right foot encountered a second obstruction and caused him to fall, with his right shoulder taking the brunt of the impact by striking the curb of North Capitol Street. Although Sullivan did not initially see what had tripped him, as he was lying on the street, he could "clearly" see that his foot had first gotten caught on the "edge of [a] manhole cover," and that his foot then tripped on the "depression surrounding the manhole." Sullivan believed that absent the depression he would have been able to regain his balance.

Passing individuals helped Sullivan stand back up and although he immediately felt pain that was "somewhat severe," he nonetheless believed that he was healthy enough to continue to Union Station to go home. On the train ride,

however, Sullivan began to feel "pain, a lot of pain . . . [that] was very, very excruciating at times." And after returning home, Sullivan was taken to the emergency clinic and then an orthopedic surgeon,[3] who diagnosed Sullivan with a "pretty complex fracture" of his right shoulder, whereby the socket and ball have "completely dislocated." Sullivan thereafter underwent intensive surgery, missed thirteen days of work, and attended numerous physical therapy and follow-up sessions for about one year after the initial fall. He filed suit against AboveNet for negligently creating the condition around the manhole cover that caused his fall, and against the District for its failure to monitor and inspect the work.

At trial, Sullivan did not call any employees or representatives of AboveNet as witnesses to prove that AboveNet was actually the party responsible for the condition. Instead, Sullivan relied almost exclusively on a set of permits issued by the District of Columbia Department of Transportation ("DDOT") to AboveNet for the purpose of excavating and installing electrical conduits, a telecom connection, and a new manhole at the location of "50 F Street, [N.W.], Washington, D.C. 20001," from December 1, 2008 through May 5, 2009. The claimed inference being that AboveNet had installed the manhole cover at the intersection of F Street

---

[3] The doctor, David Zijerdi, M.D., testified as to Sullivan's injuries and treatment at trial pursuant to a videotaped deposition taken on January 28, 2014.

and North Capitol Street based on these permits, and had caused a depression to form around it.[4]

To demonstrate that AboveNet had notice of the depression, Sullivan called his former co-worker Jennie Lam-Nagata, who took pictures of the manhole cover and depression approximately two weeks after Sullivan's fall and testified that she had tripped on the same "uneven repair road" herself a "couple of times" "less than" two weeks before Sullivan's accident. Lam-Nagata also maintained that there were no changes to the area from the times she tripped to when she took the photographs.[5]

Sullivan also presented Richard Balgowan as an expert witness on highway municipal engineering and asphalt pavement to testify that AboveNet had failed to maintain the proper standard of care during the pavement "backfilling" process

---

[4] Sullivan had sought to also proffer into evidence maps of the intersection between F Street and North Capitol Street as part of the work permits, claiming that they depicted AboveNet's traffic control plan and work being conducted at the intersection where the accident occurred. However, because the traffic control plan was insufficiently authenticated by Sullivan, the trial court did not admit the maps into evidence.

[5] Lam-Nagata's photographs depicting a noticeable depression surrounding the manhole cover at the alleged intersection were admitted into evidence and available to the court on appeal.

after installing the new manhole, and that this caused the depressed surrounding surface area.[6]  Balgowan first testified as to his methodology.  He stated that an asphalt expert can determine the cause of sinking pavement even after construction was complete because:

> The American Association of State Highway and Transportation Officials ha[ve] manuals . . . with regard[] to construction backfilling, using hot mix asphalt or asphalt to concrete.  And if those standards are not complied with, there will be settlement that occurs in almost every single case.  I'm going to say in every case . . . .

Balgowan also maintained that he could make a nationally recognized and accepted determination as to whether backfilling was improperly completed based solely on photographs of the condition, because the photographs constitute a "visual assessment of what has been the outcome of some previous work[,]" and that photos have been used at national conferences and seminars to diagnose like-problems.  Based on Balgowan's credentials and his testimony regarding his methodology, the trial court qualified him as an expert.  In particular, the trial court

---

[6] During voir dire, Balgowan testified that he was a certified highway municipal engineer in ten states, having graduated from the New Jersey Institute of Technology with a bachelor's degree in civil engineering.  He was also a certified asphalt technician and taught at Rutgers University and the University of Wisconsin on the subjects of work-zone safety and highway maintenance.  He sat on several committees of the Transportation Research Board, a branch of the National Academy of Sciences, and was familiar with the national standards of care applied to municipal road construction and design.

noted that Balgowan had demonstrated that the use of photographs for diagnosing roadwork issues was an established technique, and therefore presumptively reliable.

Balgowan next testified to the cause of the depression in this case. After reviewing the permits issued by DDOT to AboveNet and Lam-Nagata's photographs, Balgowan opined that the backfilling work performed by AboveNet after installing the new manhole was improper because if AboveNet had "follow[ed] established standards and guidelines for backfilling and compacting, you will not get that kind of settlement [i.e., depression]." He elaborated that, in order to avoid "settlement" of the type found here, once a company finishes backfilling the pavement, it must then "compact it" to eliminate the "air voids between the little particles." Otherwise, vibrations caused by vehicles driving past will cause depressions in the surface area to start forming. Balgowan dismissed the possibility that this depression would meet the acceptable standard even for "temporary" patches, as opposed to a more permanent restoration, or that a recent snow storm could have caused the problem. Balgowan maintained that a "shortcut" was taken here, and that "maybe another hour['s]" worth of work was needed to avoid this kind of settlement. However, Balgowan admitted that he never actually visited the location of the incident or conducted any

additional investigation other than a review of the photographs, but maintained that "[n]o additional investigation was required." During cross-examination, Balgowan also conceded that — based on his understanding — AboveNet did not do the actual roadwork.

At the end of Sullivan's case, the District and AboveNet filed Rule 50 (a) motions for judgment as a matter of law. AboveNet principally claimed that Sullivan introduced no evidence that AboveNet actually performed the poor work alleged here. AboveNet made note of Balgowan's cross-examination testimony, in which he answered "no" when asked if it was his understanding that AboveNet "did this work." AboveNet also argued that Sullivan presented no evidence as to how long the depression existed or whether AboveNet knew about it to infer notice. After an extended colloquy between the trial court and the parties on these issues, the trial court reserved ruling on the motions and the defense began its case.

As part of its defense, the District called James T. Henry, a DDOT supervisory engineering technician, to testify about the city's permit and inspection process, and the obligations of the permit holder. Henry noted that in 2010, he conducted an inspection of the intersection between F Street and North Capitol Street after a claim was filed that someone had been injured while crossing and

observed that a new manhole was installed at the intersection "labeled AboveNet." In addition, later on, in response to AboveNet's counsel's question as to whether Henry believed "AboveNet did the work," Henry stated: "That's correct."

The District also read into evidence some of AboveNet's interrogatory responses for the purpose of demonstrating that AboveNet had some responsibility over the work performed. Specifically, AboveNet responded that "Jones Utilities Construction" was contracted by AboveNet "to excavate certain areas of North Capitol Street, [N.W.], E Street, [N.W.], and F Street, [N.W.] in relation to the installation of fiber optic cables[,]" and that "[t]his work was performed pursuant to the permits issued by the District of Columbia." AboveNet also admitted in its interrogatory responses that "[t]he subject manhole was a new installation" related to the permits. At the close of the defense's case, the District and AboveNet renewed their Rule 50 (a) motions, but the trial court again reserved ruling.

The jury subsequently returned a verdict in favor of the District, but against AboveNet, and awarded Sullivan $300,000 in damages. After the trial court dismissed the jury, the trial court took to the issue of resolving the pending Rule 50 (a) motions made at the close of Sullivan's case and again at the close of the defense. Preliminarily, the trial court noted that "[d]amages has never been an

issue in this case[,]" and that the issue in this case has always been about establishing breach. First, the trial court concluded that Lam-Nagata's testimony that she had tripped at the same location "maybe two weeks, or less than that" prior to Sullivan was insufficient to establish constructive notice, and that this was the only testimony referencing a timeframe. The trial court determined that there was no clear timeframe, based on this testimony, on how long the depression had been present because Lam-Nagata never clarified when she first saw the depression or whether she had "tripped twice on the same day or different days."

However, even assuming that there was constructive notice, the trial court took extensive issue with Sullivan's lack of evidence that AboveNet was the party actually responsible for installing the manhole and backfilling the pavement. Sullivan's evidence on this point relied almost exclusively on the DDOT permits, and the court questioned "how we get from 50 F Street, Northwest [(the work location listed on the permits)] to the intersection of North Capitol and F Street [(the location of the accident)]." The court also noted that Sullivan's expert Balgowan explicitly said "no" in response to AboveNet's question asking whether it was his understanding that AboveNet did the work. Lastly, the trial court concluded that Balgowan also failed to identify "any concrete standards upon which a finding of negligence could be based." The court noted that, while

Balgowan referenced many standards, there was "never any effort to elicit what those standards exactly were, and how the conduct of . . . AboveNet deviated from those specific standards."

Sullivan's counsel objected, observing that the court appeared to have granted a "Rule 50 motion based on evidence as it existed at the close of plaintiff's evidence," which he did not think that the court, "procedurally, ha[d] the power to do . . . at this stage." Counsel instead noted that the appropriate standard was to consider all of the evidence in the record, including the defense's case, and that there was clear evidence that AboveNet had done the work pursuant to the permits in the full record. The trial court disagreed, explaining that it had simply taken the previous Rule 50 (a) motion made at the close of Sullivan's case "under advisement." Accordingly, the trial court granted AboveNet's pending motion for judgment as a matter of law filed at the end of Sullivan's case, and this appeal by Sullivan followed.

## II.    Discussion

This court is "obliged to respect the jury's prerogatives." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008).

Therefore, "[o]ur review of the trial court's grant of a [m]otion for [j]udgment as a [m]atter of [l]aw is *de novo*[.]" *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 322 (D.C. 2007). "A trial court may grant a motion for judgment as a matter of law only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor." *NCRIC, Inc.*, *supra*, 957 A.2d at 902 (citation and internal quotation marks omitted). Accordingly, "[a]s long as there is some evidence from which jurors could find that the party has met its burden, a trial judge must not grant a [motion for judgment as a matter of law]." *Scott v. James*, 731 A.2d 399, 403 (D.C. 1999) (citation and internal quotation marks omitted). Further, "[i]f it is possible to derive conflicting inferences from the evidence, the trial judge should allow the case to go to the jury." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (citations and internal quotation marks omitted). The trial court's grant of a motion for judgment as a matter of law is appropriate, however, "when the jury has no evidentiary foundation on which to predicate intelligent deliberation and reach a reliable verdict." *Scott*, *supra*, 731 A.2d at 403 (citations and internal quotation marks omitted). In order to prove negligence, Sullivan must provide evidence that: "(1) [AboveNet] owed a duty of care to [Sullivan], (2) [AboveNet] breached that duty, and (3) the breach of duty proximately caused damages to [Sullivan]." *Tolu*

*v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008) (citations and internal quotation marks omitted).

On appeal, Sullivan challenges all three bases on which the trial court granted AboveNet's motion for judgment as a matter of law. The issues of party responsibility and constructive notice pertain to whether AboveNet owed Sullivan a duty of care, while the adequacy of the expert's testimony concerns whether AboveNet breached the pertinent standard of care assuming it had such a duty. *See, e.g.*, *Youssef v. 3636 Corp.*, 777 A.2d 787, 794 (D.C. 2001); *see also Snyder v. George Wash. Univ.*, 890 A.2d 237, 244 (D.C. 2006). We review each issue in turn.

### A. *Evidence of Party Responsibility*

Sullivan first argues that the trial court erred in concluding that there was insufficient evidence to prove that AboveNet actually did the work alleged in this case. He claims that the full record definitely included evidence that the "work had been performed under AboveNet's permit and direction." We agree.

At the end of trial, the following evidence was presented to the jury for deliberation. First, Sullivan had proffered into evidence DDOT permits establishing that between December 1, 2008 and May 5, 2009, AboveNet was granted a permit by the city to perform work at "50 F Street, [N.W.], Washington, D.C. 20001." AboveNet was to excavate the road and construct a trench to install electrical conduits and a telecom connection, and install a new manhole. Second, during the District's defense, the District called DDOT supervisor Henry, who testified that the manhole cover bore AboveNet's name, and confirmed that "AboveNet did the work." Third, the District also read into evidence AboveNet's own interrogatory responses stating that the DDOT permits covered the excavation of North Capitol Street and F Street, and that AboveNet had contracted Jones Utilities Construction to do the work. There is no doubt that under normal circumstances there was enough evidence for the jury to reason that AboveNet was the party responsible for the condition.[7]

---

[7] The fact that there was somewhat conflicting evidence as to whether contractor Jones Utilities Construction or AboveNet itself was responsible for the roadwork is irrelevant in determining AboveNet's potential liability. First, all inferences are viewed in the light *most* favorable to the non-moving party, and so we view the evidence in favor of holding AboveNet personally responsible for creating the condition. *See Majeska*, *supra*, 812 A.2d at 950. Second, during AboveNet's opening statement, counsel admitted that AboveNet had a project manager, Kris Kobylski, "on this site the entire time the work was being done from early January until late April." Consequently, even if Jones Utilities Construction was contracted to do the work, AboveNet, as the on-site managing entity, still

(continued…)

However, this was not one of those normal circumstances because it appears the trial court expressly limited its decision to grant AboveNet's motion for judgment as a matter of law to the evidence produced at the end of Sullivan's case (i.e., solely to the permits), even though it had waited until after the jury rendered a verdict to make its decision. AboveNet counters that the trial court had the authority to make this decision but cites to no direct or persuasive case law. Based on its brief, it also seems that AboveNet believes that this court's review should similarly be limited to the evidence presented as of the close of Sullivan's case. Both assessments are incorrect.

First, we are not bound by the trial court's decision to limit its ruling to the evidence presented by Sullivan. *See, e.g.*, *Silva v. Worden*, 130 F.3d 26, 30 (1st Cir. 1997) ("We consider all evidence offered during trial, including evidence introduced by the defendants. We do this notwithstanding the defendants' motion for directed verdict at the end of [the plaintiff's] case and the court's statement that it would rule, although at the close of all evidence, only on the plaintiff's evidence."). On appeal, this court conducts a *de novo* review of the record,

---

(…continued)
owed a duty to pedestrians. *See Traudt v. Potomac Elec. Power Co.*, 692 A.2d 1326, 1334-35 (D.C. 1997) (approving a theory of negligence liability whereby employer of independent contractor retained "supervisory control" of the work).

viewing all of the evidence in the light most favorable to the non-moving party in deciding whether a motion for judgment as a matter of law was appropriate. *See, e.g.*, *Scott*, *supra*, 731 A.2d at 403; *see also Boyrie v. E & G Prop. Servs.*, 58 A.3d 475, 477 (D.C. 2013). Here, our review of the record indicates that there was evidence that AboveNet did the work.

Second, although we do not dispute that the trial court may reserve ruling on a Rule 50 (a) motion made at the close of the plaintiff's case until after the jury verdict,[8] we disagree that the trial court may decide the reserved motion based solely on the record as it existed at the close of the plaintiff's case. As explained in *Teneyck v. Omni Shoreham Hotel*, 361 U.S. App. D.C. 214, 229, 365 F.3d 1139, 1154 (2004), with regard to the equivalent Fed. R. Civ. P. 50 (a):[9]

> [Rule 50 (a)] does not authorize a trial judge, after the
> defense has presented its case (in whole or in part), to

---

[8] Contrary to Sullivan's claim, there is no requirement that a party raise a Rule 50 (b) motion after the jury renders its verdict when the trial court has not entered judgment and instead conducts a hearing on a reserved Rule 50 (a) motion. *See Marcel Hair Goods Corp. v. Nat'l Sav. & Trust Co.*, 410 A.2d 1, 5 (D.C. 1979) ("To hold a party accountable for failing to interject a [Rule 50 (b)] motion when the trial court conducts a post-verdict hearing on a reserved [Rule 50 (a)] motion would be irrational. Super. Ct. Civ. R. 1 directs that the rules be 'construed to secure the just, speedy, and inexpensive determination of every action.'").

[9] Although not binding, this court looks to decisions of the federal courts as persuasive authority when interpreting Super. Ct. Civ. R. 50. *Street v. Hedgepath*, 607 A.2d 1238, 1243 n.5 (D.C. 1992).

> revisit, and grant, a defense motion for judgment as a matter of law made at the close of the plaintiff's case without considering, in addition to the evidence presented in the plaintiff's case, the evidence presented by the defense.

(quoting *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1305 n.31 (11th Cir. 1998)). We are persuaded by the federal interpretation of Rule 50 (a). To hold otherwise would unacceptably exalt "form over substance," whereby the trial court's decision to take a case away from the jury is based more on procedural formalities than fairness and facts on the ground. *See, e.g.*, *District of Columbia Office of Tax & Revenue v. Shuman*, 82 A.3d 58, 67-69 (D.C. 2013). Moreover, such a holding is inherently incompatible with this court's standard of review on appeal to conduct a *de novo* review of the full record. *See Hill*, *supra*, 933 A.2d at 322. Therefore, to clarify, we hold that when a motion for judgment as a matter of law is made at the close of the plaintiff's case but a decision is reserved until after the defense had presented its case, the trial court must consider the full record as it exists at the time in deciding the reserved motion.[10]

---

[10] Alternatively, AboveNet's own counsel may have judicially admitted to backfilling the road where Sullivan had fallen during his opening statement. Specifically, during AboveNet's opening statement made immediately after Sullivan presented its opening at the start of trial as to why AboveNet and the District were liable for his injuries, AboveNet's counsel stated openly that "[m]y client [i.e., AboveNet] had done work in that area. They had done it according to the permits with [the District of Columbia], and they had done it properly." AboveNet's counsel further explained to the jury that AboveNet was "not done

(continued…)

## B. Constructive Notice

"To make out a prima facie case of liability predicated upon the existence of a dangerous condition it is necessary to show that the party against whom negligence is claimed had actual notice of the dangerous condition or that the condition had existed for such length of time that, in the exercise of reasonable care, its existence should have become known and corrected." *Anderson v. Woodward & Lothrop*, 244 A.2d 918, 918-19 (D.C. 1968) (per curiam). In deciding this issue, we reemphasize that, on appeal from the grant of a motion for judgment as a matter of law, this court will view the evidence in the light *most favorable* to the non-moving party and will give that party the benefit of every permissible inference from the evidence. *See Majeska*, *supra*, 812 A.2d at 950.

---

(…continued)

yet." And that, "[it] had only done the first phase of this construction. [It] had dug the trench. [It] had put in the backfill. [It] had put the temporary patch down. . . . So [it was] still in the process of this work being done." Under such circumstances, it is arguable that AboveNet's counsel's unequivocal admission of responsibility constituted a binding judicial admission. *See Bostic v. Henkels & McCoy, Inc.,* 748 A.2d 421, 423 n.2 (D.C. 2000); *see also Bandini v. Bandini*, 935 N.E.2d 253, 265 (Ind. Ct. App. 2010) ("Generally, counsel's opening statement is not evidence . . . . However, a clear and unequivocal admission of fact, or a formal stipulation that concedes any element of a claim or defense, is a binding judicial admission."). That being said, we need not decide whether AboveNet's counsel affirmatively made a binding judicial admission given our prior holding that the trial court should have reviewed the whole record when ruling on the reserved Rule 50 (a) motion.

Further, "we recognize that an issue such as constructive notice is peculiarly within the province of the jury," as long as the jury does not engage in "idle speculation." *Marinopoliski v. Irish*, 445 A.2d 339, 341 (D.C. 1982).

Here, Sullivan concedes that AboveNet did not have actual notice of the depression, but argues that Lam-Nagata's testimony that she had herself tripped on the same surface area a couple of times about "two weeks" prior to Sullivan's fall was sufficient to infer constructive notice, and therefore was an issue for the jury to decide. Assuming without deciding whether Sullivan even needed to prove constructive notice and contrary to the trial court's conclusion that Lam-Nagata's testimony was insufficient to establish a reasonable timeframe, this court is of the opinion that, viewed in the light most favorable, her statement, coupled with her verification that the depression had not changed between the times that she fell and her photographs of the depression taken approximately two weeks after Sullivan fell (which Sullivan himself also confirmed looked the same), permitted the inference that the depression had existed for at least two weeks before the accident. *See, e.g.*, *Wilson v. Wash. Metro. Area Transit Auth.*, 912 A.2d 1186, 1190 (D.C. 2006) ("Although each case has its own peculiar circumstances, the duration of the alleged hazard is an important factor in establishing constructive notice."). The fact that no specific dates were given by Lam-Nagata does not render, in and of

itself, her testimony insufficient. *Compare Bostic*, *supra* note 10, 748 A.2d at 426-27 (holding Bostic's testimony that the dangerous walkway had existed for "[s]everal months" sufficient to establish constructive notice) *with Wilson*, *supra*, 912 A.2d at 1190-91 (concluding that Wilson's testimony that she was on the bus for thirty minutes before she slipped on "dry and sticky" soda was insufficient to establish how long the hazard existed). Consequently, Lam-Nagata's testimony, together with the fact that the defect was located at a major intersection, and the DDOT permits and other evidence establishing that AboveNet was actively working in the area from December 2008 to May 2009,[11] was enough evidence to let the jury decide whether AboveNet should have known about the depression in time to correct it. *Cf. Briscoe v. District of Columbia*, 62 A.3d 1275, 1279-80 (D.C. 2013) (concluding that the District lacked notice even if the defective curbstone existed for as long as two years because it was not located at a busy or conspicuous location).

---

[11] As previously mentioned *supra* note 7, during AboveNet's opening statement, counsel also conceded that AboveNet had a project manager, Kris Kobylski, "on this site the entire time the work was being done from early January until late April[,]" which was more than a month after Sullivan had been injured.

### C. Expert Testimony

Lastly, Sullivan takes issue with the trial court's finding that his expert's testimony failed to establish a concrete standard of care under which a claim of negligence can be maintained. Preliminarily, he claims that Balgowan's testimony was not even necessary because a tripping hazard was "within the realm of common knowledge and everyday experience[.]" *Bostic*, *supra* note 10, 748 A.2d at 425. Without deciding whether Balgowan's testimony was necessary, we conclude that Balgowan's testimony was sufficient to establish an applicable standard of care by which AboveNet's work could be measured.

"When an expert's testimony is required, the expert must articulate and refer to a standard of care by which the defendant's actions can be measured." *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990). This is because "[i]f the standard itself is not proven, then a deviation from that standard is incapable of proof." *Id.* In so doing, when "normative standards are used by an expert as a basis for assessing negligence, at the very least the expert must be specific as to what standards were violated and how they were violated." *Id.* at 315. "Generalized references" to national standards are insufficient to establish a standard upon which the defendant's actions can be measured. *See Briggs v.*

*Wash. Metro. Area Transit Auth.*, 375 U.S. App. D.C. 343, 350, 481 F.3d 839, 846 (2007).

For example, in *Carmichael*, we concluded that appellees' expert witness on prison security failed to establish an adequate standard of care to determine whether the District was negligent in controlling contraband weapons within its prison. 577 A.2d at 314-15. Specifically, his conclusion that there were "too many shanks" was based primarily on his own experiences, and his references to national and District of Columbia standards were generalized, without mentioning a specific standard or regulation that the District had breached. *Id.* In contrast, in *District of Columbia v. Price*, 759 A.2d 181, 183-84 (D.C. 2000), this court concluded that appellee's expert on police practices sufficiently established the standard of care assigned to police when a prisoner in custody is ill or intoxicated. Specifically, the expert testified that, under both the national standard of care and specific District municipal regulations, the police were required to obtain immediate medical attention for the prisoner under such circumstances, and that the District's response in this case had been a deviation from those standards because the officer failed to call an ambulance "immediately upon coming at the scene of the accident." *Id.* at 184.

Balgowan's testimony leans closer to the expert's testimony in *Price* than the one in *Carmichael*. Despite the fact that Balgowan only referenced "generally" to the standards set forth by the American Association of State Highway and Transportation Officials and did not appear to give a specific provision that he believed AboveNet had breached, Balgowan at the very least did explain that under the "established standards and guidelines for backfilling and compacting," the material must be compacted during the backfilling process to avoid air pockets from forming and depressions from occurring. He further opined that there was a clear deviation from that practice in this case because, if those standards had been complied with, there would be no depression that was evident in the photographs that he had reviewed. This testimony, although still arguably rather broad, is different from the testimony of the *Carmichael* expert because Balgowan, at the very least, specified "as to what standards were violated" (the backfilling process during restoration) and "how they were violated" (the failure to compact the pavement to prevent air bubbles causing the settlement). *Carmichael*, *supra*, 577 A.2d at 315.

The fact that Balgowan was unsure whether AboveNet actually did the roadwork is unimportant because, as an expert witness on road repair, his purpose was to establish the baseline standard of care and whether the roadwork deviated

from that standard. The full record already provided sufficient evidence that AboveNet did the work and, therefore, had such a duty of care. Likewise, it is also inconsequential that Balgowan did not know exactly how the backfilling was actually performed in this case because he explained that the use of photographs alone was a nationally accepted form of diagnosis for roadwork and the trial court accepted his methodology. *See, e.g.*, *President & Dirs. of Georgetown Coll. v. Wheeler*, 75 A.3d 280, 291-92 (D.C. 2013). Any shortcomings in Balgowan's analysis "went to the weight of his testimony rather than its admissibility and therefore" presented an issue for the jury to decide. *NCRIC, Inc.*, *supra*, 957 A.2d at 906.

## III. Conclusion

There was evidence in the full record establishing each element of negligence. Accordingly, the trial court erred in granting AboveNet's reserved motion for judgment as a matter of law. We therefore reverse the trial court's order and remand the case for the trial court to reinstate the jury verdict and award.

*So ordered.*