*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0497

CATHERINE M. LEACH, APPELLANT,

v.

ONE PARKING 555, LLC, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2021-CA-000111-B)

(Hon. Hiram E. Puig-Lugo, Motions Judge)

(Argued March 29, 2023                              Decided August 1, 2024)

*Kevin M. Leach* for appellant.

*Ellen R. Stewart* for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, SHANKER,[1] *Associate Judge*, and GLICKMAN, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: This appeal arises from the trial court's

order granting summary judgment to appellee One Parking 555, LLC ("One

---

[1] Judge AliKhan was originally assigned to this case. Following her confirmation to the United States District Court for the District of Columbia on December 12, 2023, Judge Shanker was assigned to take her place on the division.

Parking"), which disposed of appellant Catherine Leach's claims of negligence and negligence per se. Ms. Leach's complaint against One Parking alleged that she sustained injuries by tripping and falling on a single step riser located in a parking garage operated by One Parking, and that the accident occurred because the single step was "improperly marked and inconspicuous." The trial court granted One Parking's motion for summary judgment on the grounds that Ms. Leach failed to present specific facts establishing the existence of a dangerous condition. We agree with the trial court and therefore affirm.

## I.     Facts and Procedural Background

On January 25, 2018, Catherine Leach tripped and fell on a single step riser in a parking garage operated under lease by One Parking at 555 Twelfth Street, N.W. In front of the single step were yellow crosshatched lines indicating a pedestrian walkway. *See* Addendum Photographs 1 and 2. There were handrails on each side of the stair,[2] and the vertical edge of the stair was highlighted in yellow while the top of the landing was painted dark gray. *Id.* The garage also had no apparent lighting issues. According to the incident report written by a security officer who responded after the fall occurred, Ms. Leach's injuries included "an open wound on

---

[2] The handrails were not sloping, which is understandable since there was only one step.

her nose" and "a big [contusion] on her face." Approximately three years later, on January 4, 2021, Ms. Leach filed a complaint against One Parking alleging negligence and negligence per se. In the complaint, Ms. Leach claimed that the single step was "improperly marked and inconspicuous," such that One Parking breached its duty "to exercise ordinary care under the circumstances to keep the premises reasonably safe, and to control, inspect, operate, maintain, manage, and/or repair the . . . parking garage." Ms. Leach also claimed that One Parking failed to maintain the parking garage in accordance with industry standards articulated in the District of Columbia Property Maintenance Code, ASTM International's Standard Practice for Safe Walking Surfaces,[3] and the National Fire Protection Association's ("NFPA") Life Safety Code.[4]

One Parking filed a motion for summary judgment, arguing that there exists no genuine dispute of material fact and that Ms. Leach does not have sufficient evidence for a jury to conclude: (1) that a hazardous condition caused the fall; (2) that One Parking owed a legal duty to Ms. Leach; and (3) that One Parking had

---

[3] ASTM International, formerly known as the American Society for Testing and Materials, is a globally recognized nonprofit organization that develops and publishes approximately 12,000 technical consensus standards.

[4] The Life Safety Code is "a nationally published model code that provides minimum safety requirements" for all stages of a building life cycle in both new and existing structures.

actual or constructive notice of the hazardous condition. *See Johnson v. District of Columbia*, 225 A.3d 1269, 1275 (D.C. 2020) (holding that, at the summary judgment stage, a genuine dispute of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict" in the nonmoving party's favor). While the trial court found that One Parking owed a legal duty to Ms. Leach, it granted summary judgment in favor of One Parking because it found that Ms. Leach failed to present sufficient evidence for a reasonable factfinder to conclude that One Parking had constructive notice of a hazardous condition, as the facts alleged by Ms. Leach failed to establish the existence of a hazardous condition.

The trial court examined a photograph of the single step where Ms. Leach fell, which one of Ms. Leach's experts included in his report. The court concluded that the photograph "d[id] not depict a dangerous condition at all." In noting: (1) the "gray pavement area leading up to the step," (2) the "diagonal yellow lines draw[ing] attention to the step," (3) the bright yellow "vertical riser leading to the tread . . . providing a yellow horizontal marker announcing a change in elevation," and (4) the dark-colored tread that extended into the landing, the trial court determined that the "contrasts in coloration" between the bright yellow vertical riser leading to the darkly colored tread "provide[d] stark visual notice that a change in elevation [wa]s about to occur." Finally, the trial court concluded that the absence of prior reported injuries on the single step cut against Ms. Leach's argument that

the step presented a hazardous condition, and that Ms. Leach's expert "opined that additional signage was advisable," but "did not testify that safety standards required or mandated the installation of such signage." Ms. Leach timely appealed.

## II.    Discussion

Under the District of Columbia's tort law, a plaintiff alleging negligence must prove that "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008). When the claim of negligence is "predicated upon the existence of a dangerous condition," the plaintiff must prove that the defendant had actual or constructive notice of the condition. *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 356 (D.C. 2015) (internal quotation marks omitted) (quoting *Anderson v. Woodward & Lothrop*, 244 A.2d 918, 918 (D.C. 1968) (per curiam)). Moreover, in cases alleging negligence in the maintenance of a building, such as a parking garage, "the plaintiff must also show that the defendant either knew or should have known–i.e., had constructive notice– of the hazardous condition" in order to establish the requisite duty of care. *Jones v. NYLife Real Est. Holdings, LLC*, 252 A.3d 490, 495 (D.C. 2021); *see also Wise v. United States*, 145 F. Supp. 3d 53, 65 (D.D.C. 2015) ("The notice requirement exists in tandem with the general rule that 'the applicable standard for determining whether

an owner or occupier of land has exercised the proper level of care . . . is reasonable care under all of the circumstances.'" (quoting *Croce v. Hall*, 657 A.2d 307, 310 (D.C. 1995))).

Ms. Leach argues that the trial court erred in concluding that she failed to allege specific facts evidencing the existence of a dangerous condition. In particular, Ms. Leach asserts that the expert reports finding that One Parking created a dangerous condition by failing to make the single step conspicuous, as well as the multiple affidavits providing details about the fall, could enable a reasonable jury to conclude that a dangerous condition existed and that One Parking knew or should have known about the condition. Ms. Leach also contends that the trial court erred by "improperly disregard[ing] expert evidence and weighing the facts by itself to determine no reasonable jury could conclude that" the single step constituted a dangerous condition.[5]

Conversely, One Parking argues that the trial court did not err because "there is no evidence to support Appellant's allegations that a hazardous condition did exist or that One Parking had notice of any alleged hazard." One Parking contends that the expert reports do not establish a genuine issue of material fact because both

---

[5] Ms. Leach does not advance any arguments related to her claim of negligence per se; we therefore treat this claim as abandoned. *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008).

experts "admitted that there is no codified standard" for how to paint a single step in order to make it conspicuous, and because the step in question already utilizes visual cues that the experts suggest are necessary to make a step conspicuous.

## A. Standard of Review

We review the trial court's order granting summary judgment to One Parking de novo. *Jones*, 252 A.3d at 495. Applying the same standard as the trial court, "we consider whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* If the moving party meets this burden, then the burden will shift to the non-moving party to present evidence proving that a genuine issue of material fact exists. *Id.* The non-moving party "may not rely on conclusory allegations or denials but must set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted) (quoting *Tolu*, 945 A.2d at 600). We view the evidence in the light most favorable to the non-moving party, who "is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Id.* (internal quotation marks omitted) (quoting *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991)).

Because this case alleges negligence in the maintenance of a parking garage, Ms. Leach must prove that One Parking had constructive notice of a dangerous condition in order to prove that it owed a duty of care to Ms. Leach. *See Sullivan*, 112 A.3d at 356. First, we analyze the issue of constructive notice, which is necessary to determine whether One Parking owed a duty of care to Ms. Leach. Then, we review the adequacy of the experts' reports and deposition testimony, which concerns whether One Parking breached the applicable standard of care. *See Sullivan*, 112 A.3d at 354 ("The issues of party responsibility and constructive notice pertain to whether [appellee] owed [appellant] a duty of care, while the adequacy of the expert's testimony concerns whether [appellee] breached the pertinent standard of care assuming it had such a duty.").

We conclude that the trial court erred when it held that One Parking owed a duty to Ms. Leach while also holding that she did not have sufficient evidence to prove constructive notice. However, we agree with the trial court's determination that no reasonable factfinder could conclude that One Parking had constructive notice of a hazard, because Ms. Leach is unable to prove that a hazard exists in the first place.

**B. Failure to Establish Constructive Notice**

On appeal, Ms. Leach argues that the record evidence establishes that One Parking had constructive notice of the dangerous condition, the single step riser, which could have been discovered and corrected if One Parking hired qualified personnel to conduct regular safety inspections in the garage. Because Ms. Leach fell on January 25, 2018, and One Parking began operating the garage on August 19, 2016, Ms. Leach claims that One Parking had seventeen months to inspect the premises, but failed to do so because of budget constraints. According to Ms. Leach, One Parking deviated from a reasonable standard of care set forth by industry standards established by the expert reports, as well as One Parking's contractual obligation "to make the premises safe, including inspecting for dangerous conditions like the improperly marked riser" pursuant to the lease agreement.

In order to survive summary judgment, Ms. Leach must establish that One Parking had constructive notice of a dangerous condition, meaning "the condition had existed for such a length of time that, in the exercise of reasonable care, its existence should have become known and corrected." *Sullivan*, 112 A.3d at 356 (internal quotation marks omitted) (quoting *Anderson*, 244 A.2d at 918-19). While this court has recognized constructive notice as an issue that is "peculiarly within the province of the jury," we discourage a jury decision when the evidence is so

sparse that it causes the jury to "engage in idle speculation." *Id.* at 356-57 (quoting *Marinopoliski v. Irish*, 445 A.2d 339, 341 (D.C. 1982)). Therefore, if at the summary judgment stage the non-moving party fails to allege specific facts that could enable a jury to find that the moving party had constructive notice, the moving party will prevail on summary judgment. *See Jones*, 252 A.3d at 495. The existence of a hazard "is not sufficient in and of itself to provide constructive notice of that defect to the entity that maintains the property." *Id.* at 496 (internal quotation marks omitted) (quoting *Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 378 (D.C. 2009)).

In *Wise*, the U.S. District Court for the District of Columbia applied this court's precedent to determine that the appellant could not establish constructive notice by arguing that the government would have discovered the hazard if it had fulfilled its duty to conduct regular inspections, because there was not sufficient evidence of a hazard to prevent the factfinder from engaging in idle speculation. 145 F. Supp. 3d at 66-67. The plaintiff filed suit against the United States under the Federal Tort Claims Act, alleging that he fell down a stairwell in the Federal Reserve building due to a defective handrail. *Id.* at 55-56. The plaintiff failed to present evidence establishing that the handrail was defective at any point prior to his accident, and the evidence indicated that people regularly used the stairwell with no previous reports of a defect in the handrail. *Id.* at 66. Despite the absence of

evidence proving the existence of a hazard, the plaintiff argued that the government had constructive notice of the hazard, because the government would have discovered the defective handrail if it had fulfilled its duty of care by inspecting the handrail at least twice a year. *Id.* at 66-67. The district court found that the plaintiff could not advance this argument because "doing so invites this Court to engage in the kind of speculation that the District of Columbia Court of Appeals has discouraged in the constructive notice context." *Id.* at 67; *see Sullivan*, 112 A.3d at 356-57 ("'[W]e recognize that an issue such as constructive notice is peculiarly within the province of the jury,' as long as the jury does not engage in 'idle speculation.'" (quoting *Marinopoliski*, 445 A.2d at 341)). The district court concluded that even if the government breached an alleged duty to inspect, the plaintiff could not prove that the government had constructive notice without proof that a dangerous condition existed. *Wise*, 145 F. Supp. 3d at 67.

Similarly, the evidence in the present record could not enable a factfinder to conclude that the single step was a dangerous condition. In addition to the expert reports, which we discuss below, Ms. Leach presented affidavits from her husband, Kevin Leach, and daughter, Abigail Leach, as evidence that a dangerous condition caused her to fall. Mr. Leach's affidavit stated that as he and his wife were walking toward the stairway door in the parking garage, Ms. Leach was a few steps ahead of him and looking toward the door without any distractions. He also said that the

single step riser where Ms. Leach fell "appeared to blend into the yellow [pedestrian crosshatched] lines as a flat surface. Abigail's affidavit said that when she asked her mother how the accident occurred, her mother said, "I thought it was flat, I tripped." While this evidence indicates that Ms. Leach did not perceive the step while she was walking toward the stairwell door, it does not prove that the step was hazardous, nor does it prove that One Parking knew or should have reasonably known about the hazard. *See Davenport v. Safeway, Inc.*, No. 20-CV-1207, 2022 WL 4379016, at *4 (D.D.C. Sept. 22, 2022) ("[T]he mere happening of an accident does not impose liability or permit an inference of negligence." (quoting *Napier v. Safeway Stores, Inc.*, 215 A.2d 479, 480 (D.C. 1965))).

Moreover, the record indicates that prior to Ms. Leach's accident, there were no reports of anyone else tripping or injuring themselves on the single step riser at issue. During his deposition, Mark Pratt, President and Chief Operating Officer of One Parking, testified that One Parking was not aware of any prior complaints about patrons tripping on the single step or having difficulty perceiving the step because of the manner in which it is painted. Additionally, the trial court concluded, "the absence of any prior injuries or complaints in that area undercut [Ms. Leach's] argument that the step represented a 'dangerous condition.'" However, Ms. Leach argues that One Parking had constructive notice of the dangerous condition because it would have discovered the improperly marked step if One Parking had acted in

accordance with industry standards and hired a qualified safety professional to conduct regular inspections. Allowing Ms. Leach to advance this argument would invite a jury to engage in idle speculation because without establishing whether the hazard exists, a factfinder "can only guess whether [the hazard] existed long enough to charge [One Parking] with constructive notice." *Wise*, 145 F. Supp. 3d at 67. Therefore, even assuming that One Parking breached an alleged duty to inspect, we hold that the evidence is insufficient to establish constructive notice because the evidence does not establish the existence of a dangerous condition.

## C. Experts' Failure to Establish a Standard of Care

Expert testimony is required to prove the standard of care when it is "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average lay juror." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039 (D.C. 2014) (internal quotation marks omitted) (quoting *Tolu*, 945 A.2d at 601). Ms. Leach retained two experts in forensic engineering in order to support her claim that One Parking's deviation from the standard of reasonable care caused her to trip and injure herself. Michael Leshner, the first expert to write his report, found that the single step was a hazardous condition because the yellow crosshatched pedestrian walkway and the yellow vertical edge of the stair "create[d] an optical illusion" that made the surface appear flat. *See* Addendum Photograph 2. He also

found that the inconspicuous step violated industry codes, standards, and regulations, and that One Parking's deviation from these standards caused Ms. Leach's fall. Mr. Leshner cited three industry standards that he claims the single step violated: (1) ASTM International's Standard Practice for Safe Walking Surfaces, ASTM F1637-13; (2) the NFPA 101 Life Safety Code; and (3) the D.C. Property Maintenance Code. First, ASTM F1637-13 § 7.2.2 states, "[i]n situations where a short flight stair or single step transition exists or cannot be avoided, obvious visual cues shall be provided to facilitate improved step identification. Handrails, delineated nosing edges, tactile cues, warning signs, contrast in surface colors, and accent lighting *are examples of* some appropriate warning cues." Standard Prac. for Safe Walking Surfaces F1637-13 § 7.2.2 (Am. Soc'y for Testing & Materials Int'l 2013) (emphasis added). Second, Mr. Leshner cited the following provisions from the Life Safety Code:

> § A7.1.7.2–[S]mall changes of elevations in floors are best avoided because of the increased occurrence of missteps where the presence of single steps, a series of steps, or a ramp is not readily apparent . . . A contrasting marking stripe on each stepping surface *can be helpful* at the nosing or leading edge so that the location of each step is readily apparent, especially when viewed in descent. . . . Other methods could include a relatively higher level of lighting, contrasting colors, contrasting textures, highly prominent handrails, warning signs, a combination thereof, or other similar means.

> § 7.1.7.2.4–The presence of each step shall be readily apparent.

NFPA 101 Life Safety Code § 7.1.7.2 (Nat'l Fire Prot. Ass'n 2017) (emphasis added). Finally, section 702.1 of the D.C. Property Maintenance Code provides, "[a] safe, continuous and unobstructed path of travel shall be provided from any point in a building or structure to the *public way*." D.C. Prop. Maint. Code § 702.1 (2017) (emphasis in original).

Mr. Leshner also provided deposition testimony, which reiterated his opinion that the step was hazardous because it was inconspicuous. In his professional opinion, Mr. Leshner believed that One Parking had the authority to inspect the hazard and the opportunity to correct it. He further opined that if One Parking had engaged a pedestrian safety professional to inspect the building, that professional "would have spotted [the hazard] in a minute." However, despite Mr. Leshner's assertion that the single step violated local and national codes and industry standards, he conceded that "there is no codified standard on exactly how" to make a single step conspicuous and therefore non-hazardous.

Similarly, the second expert, Anthony Shinsky, found that Ms. Leach fell because the single step was an inconspicuous hazard. According to Mr. Shinsky, the yellow crosshatched lines in front of the stair "were confusing and created an illusion for Ms. Leach that the yellow painted riser was a stripe on the garage floor indicating

the edge of the designated walkway."  Mr. Shinsky wrote that the single step was not reasonably conspicuous in accordance with industry standards because it lacked effective delineation, a sloped handrail, and effective warning signs indicating the step's presence.  Like Mr. Leshner, Mr. Shinsky also cited ASTM F1637-13, which instructs: "[w]hen relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users."  Standard Prac. for Safe Walking Surfaces F1637-13 § 11.2 (Am. Soc'y for Testing & Materials Int'l 2013).  The standard notes that the color, bright yellow, is commonly used for this purpose.  *Id.*

In addition to the standards referenced in Mr. Leshner's report, Mr. Shinsky relied upon several other sources to support his findings.  *Guidelines for Stair Safety*, a study conducted by the National Bureau of Standards (now the National Institute of Standards and Technology) named sloping handrails as "a major cue used to identify a stair" that "may not be used on a short flight of stairs" or a single step, but could prove useful to indicate their presence and prevent an accident.  John Archea, Belinda L. Collins & Fred I. Stahl, Nat'l Bureau of Standards, *Guidelines for Stair Safety* 89 (1979).  The Guidelines also suggest that if the edges of each tread are not easily distinguishable from the top landing, the tread surfaces and nosings should be replaced or refinished to create a clear visual distinction between planes.  *Id.* at 43.

The Guidelines' preferred method to create this distinction is "mark[ing] the edge of each tread with a single built in or painted stripe which . . . [c]ontrasts notably with the remainder of the tread in color and texture." *Id.* According to the Guidelines, "stair treads and handrails should be the most conspicuous objects in the users' visual field." *Id.* at 79.

Another source, *Slips, Trips and Falls*, describes short flights of stairs as dangerous because "the difference in elevation . . . is so slight that visual cues are poor, with the result that many people don't see the steps until they have already begun to fall." William English, *Slips, Trips and Falls: Safety Engineering Guidelines for the Prevention of Slip, Trip, and Fall Occurrences* (1989). It continues, "[t]he most elegant remedy to safeguard short flights is to leave them out. If a single step is to be used, . . . care should be taken to design in all of the visual cues for the presence of steps that are practicable." *Id.* Mr. Shinsky concluded that One Parking's failure "to replace the step with a ramp, or provide the safety features necessary for Ms. Leach to safely navigate the transition before she tripped and fell, violated the nationally recognized and accepted standards of care and model codes for property maintenance."

Ms. Leach argues that the trial court "improperly disregarded" her experts' reports and deposition testimony, and wrongfully weighed the evidence in order to

determine that no reasonable factfinder could conclude that the single step represented a dangerous condition. *See Weakley v. Burnham Corp.*, 871 A.2d 1167, 1173 (D.C. 2005) ("On summary judgment, the court does not make credibility determinations or weigh the evidence."). Conversely, One Parking maintains that the trial court correctly granted summary judgment in its favor because there is no factual basis supporting the experts' opinions that the single step was hazardous.

"[T]he expert must articulate and refer to a standard of care by which the defendant's actions can be measured," and testify with specificity as to what standards were violated and how the defendant violated them. *Sullivan*, 112 A.3d at 357-58 (internal quotation marks omitted) (citing *District of Columbia v. Carmichael*, 577 A.2d 312, 314-15 (D.C. 1990)). "[A]n expert may not simply render an opinion 'as to what he or she would do under similar circumstances.'" *Wise*, 145 F. Supp. 3d at 63 (quoting *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 846 (D.C. Cir. 2007)). Instead, we require the expert to explicitly relate the asserted standard of care to nationally recognized standards that are "in fact generally followed" by other comparable facilities. *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000). Here, Ms. Leach and her experts did not establish with specificity which standards One Parking violated, since their recommendations for making a single step safe (i.e., contrasting colors and handrails) are evident in the design of the step where Ms. Leach fell.

In *Jones v. NYLife Real Estate Holdings, LLC*, we affirmed the trial court's order granting summary judgment in favor of the defendants after determining that the appellant's expert failed to establish an industry standard of care. 252 A.3d at 501. The appellant suffered a head injury after he was struck by a metal-encased pilaster "that fell off the wall in the main lobby of the office building where he worked." *Id.* at 493. He then filed suit against several defendants, including a contractor that "perform[ed] façade cleaning, repair, and restoration work on the exterior of the building." *Id.* at 494. The appellant argued that the contractor "missed a reasonably foreseeable opportunity to detect" the dangerous condition because it failed to perform inspection surveys before, during, and after the renovation. *Id.* at 500. Appellant's expert testified that the general contractor is typically responsible for inspections, and "that the manner of inspection 'depends on the standard and who is doing the inspection.'" *Id.* at 500-01. However, the expert did not specify which standard imposed a duty on the contractor to inspect the interior of the building when the scope of its work only included the building's exterior. *Id.* at 500. Indeed, the expert conceded that "there is no specific standard." *Id.* at 501. We held that the expert's testimony did not establish an industry standard for inspections because it failed to specify what standards the contractor violated and how the contractor violated them. *Id.*

In this case, Mr. Leshner and Mr. Shinsky both assert that the yellow crosshatched lines, combined with the yellow vertical edge of the stair, created an optical illusion that made the step inconspicuous. *See* Addendum Photograph 2. They also name certain standards that they claim One Parking violated by maintaining this design. However, the experts' reports and testimony all fail to establish how One Parking violated these standards. In Mr. Leshner's opinion, One Parking violated ASTM F1637-13 § 7.2.2, section 7.1.7.2 of the Life Safety Code, and D.C. Prop. Maint. Code § 702.1. But none of these provisions specifies what conduct is necessary for compliance or what conduct qualifies as a violation. For instance, ASTM F1637-13 requires single-step transitions to have "obvious visual cues" in order to indicate the presence of the step. Standard Prac. for Safe Walking Surfaces F1637-13 § 7.2.2 (Am. Soc'y for Testing & Materials Int'l 2013). The standard also included examples of visual cues, including handrails, warning signs, and contrasting colors. *Id.* The single step where Ms. Leach fell appears to utilize these cues. A photograph of the step, which Mr. Leshner included in his report, demonstrates that there were handrails on both sides of the landing, and the vertical edge of the step was painted yellow, while the surface of the landing was painted dark gray. *See* Addendum Photograph 2. Section 7.2.2 does not specify how contrasting colors or handrails must be utilized in order to comply with its requirement to design obvious visual cues to alert the presence of a single step.

Likewise, the provisions in the Life Safety Code require the "presence of each step [to] be readily apparent," but only provide suggestions of useful visual cues without specifying how to implement them. *See* NFPA 101 Life Safety Code § 7.1.7.2 (Nat'l Fire Prot. Ass'n 2017) ("[M]ethods could include a relatively higher level of lighting, contrasting colors, contrasting textures, highly prominent handrails, warning signs, a combination thereof, or other similar means."). The same is true for D.C. Prop. Maint. Code § 702.1, which requires a "safe, continuous and unobstructed path of travel," but does not define the parameters for safety and continuity. Although Mr. Leshner claims that the stair is inconspicuous due to the yellow crosshatching preceding the yellow edge of the stair, another photograph attached to Mr. Leshner's report shows that there is a gap between the crosshatching and the stair. *See* Addendum Photograph 3. During his deposition, Mr. Leshner conceded that there are no specific standards regarding the distance required between crosshatching and a step in order to make the step conspicuous. He also conceded that he did not observe any issues with the lighting in the garage. Additionally, Mr. Leshner testified that there is no guidance that defines an "optical illusion" for the purpose of identifying an inconspicuous hazard. Rather, the guidance merely "speaks to conspicuous and inconspicuous, and some of the safety literature gives examples of things that are inconspicuous." Moreover, like the expert in *Jones*, Mr. Leshner admitted in his deposition that "there is no codified

standard on exactly how" to make a single step safe and conspicuous. For these reasons, we hold that Mr. Leshner's report and testimony cannot establish a standard of care that One Parking breached.

We also conclude that Mr. Shinsky's report does not adequately establish a standard of care. Like Mr. Leshner, Mr. Shinsky's finding that the single step violated industry standards relies upon recommendations that do not specify what is required in order to meet a particular standard of care. Mr. Shinsky opined that the yellow crosshatching indicating a pedestrian walkway, combined with the yellow vertical edge of the riser, "made the area confusing without adequately identifying the change of elevation up to the landing." According to Mr. Shinsky, the parking garage's use of color violated ASTM F1637-13, which instructs: "[w]hen relying on applications of color as a warning, provide colors and patterns that provide conspicuous markings for the conditions being delineated, their surroundings, and the environment in which they will be viewed by users." Standard Prac. for Safe Walking Surfaces F1637-13 § 11.2 (Am. Soc'y for Testing & Materials Int'l 2013).

However, like the aforementioned standards, this provision does not define a conspicuous marking, nor does it specify what constitutes an inconspicuous marking. Mr. Shinsky also wrote that adequate delineation of the single step would have included a sloped handrail in accordance with the *Guidelines of Stair Safety*.

Yet, the Guidelines merely state that sloping handrails are a "major cue used to identify a stair," that their use is suggested to indicate the presence of a single step riser, and that "stair treads and handrails should be the most conspicuous objects in the users' visual field." *See* Archea et al., *supra* at 79, 89. Lastly, Mr. Shinsky claims that the "dangerous condition could have easily been avoided" if the single step was eliminated and replaced with a "sloped (or ramped) transition." This claim relies upon *Slips, Trips and Falls*, which Mr. Shinsky cited due to its assertion that "[t]he most elegant remedy to safeguard short flights [of stairs] is to leave them out." English, *supra*. This reference does not indicate that the failure to replace a single step with a ramp falls short of a certain standard of care. Therefore, because Mr. Shinsky's report relies upon standards and guidelines that do not specify what is necessary to act in accordance with their requirements, we hold that his report also cannot establish a standard of care that One Parking purportedly breached.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment to One Parking.

*So ordered.*

**ADDENDUM**

**Photograph 1**



**Photograph 2**



**Photograph 3**

