*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0672

SARAH RAMEY, APPELLANT,

v.

FOXHALL UROLOGY, CHARTERED, *et al.*, APPELLEES.

Appeals from the Superior Court of the
District of Columbia
(2019-CA-005730)

(Hon. Shana Frost Matini, Trial Judge)

(Argued October 30, 2024                    Decided April 24, 2025)

*Timothy R. Clinton*, with whom *Matthew J. Peed* was on the brief, for the appellant.

*Alfred F. Belcuore*, with whom *Andrew E. Vernick* and *Christopher J. Greaney* were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and MCLEESE and DEAHL, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: In this appeal we are asked to determine whether appellant Sarah Ramey brought her claim for medical malpractice within the three-year statute of limitations. Resolution of this question is complicated by the protracted and complex nature of Ms. Ramey's medical treatment for her pain

and symptoms. The ultimate answer to the question requires determining when Ms. Ramey received information concerning the medical cause of her ailments sufficient to accrue a cause of action.

In 2003, Ms. Ramey underwent a urethral dilation conducted by appellee Dr. Edward Dunne. Ms. Ramey suffered intense pain during the procedure and almost immediately afterwards began experiencing a suite of medical ailments that proved debilitating. For the next fourteen years, Ms. Ramey sought medical advice to determine the source of her pain. In 2017, Drs. Mario Castellanos and Lee Arnold Dellon provided Ms. Ramey medical opinions tying the urethral dilation to her symptoms. Two years later, she sued appellees. At trial, a jury found that Ms. Ramey failed to file her suit prior to the expiration of the statute of limitations.

On appeal, Ms. Ramey seeks review of four issues related to the triggering of the statute of limitations. First, she contends that the trial court erred in denying her motion for judgment as a matter of law because appellees failed to show that a plausible linkage between the urethral dilation and her ailments existed prior to her 2017 consultations with Drs. Castellanos and Dellon. Second, Ms. Ramey asserts that the trial court erred in denying her motion for a new trial because the jury instructions prejudicially altered the discovery rule test used to assess when the statute of limitations began to run. Third, Ms. Ramey argues that she was separately

entitled to a new trial due to appellees' misstatements of law during opening and closing arguments regarding what knowledge is sufficient to trigger the discovery rule. Fourth, she asserts that appellees impermissibly raised a previously waived inquiry notice argument on rebuttal closing, again entitling her to a new trial.

We hold that the trial court did not err in denying Ms. Ramey's motion for judgment as a matter of law. We further hold that the trial court did not err in denying Ms. Ramey's motion for a new trial insofar as the motion was predicated on faulty jury instructions and appellees' misstatements of law. However, we also hold that Ms. Ramey is entitled to a new trial due to appellees' improper invocation of inquiry notice on rebuttal closing. Accordingly, we remand the case for a new trial.

## I.      Factual and Procedural Background

The following facts were adduced from the extensive record in this case, which includes Ms. Ramey's medical records and correspondence between Ms. Ramey, her family, and her medical providers, as well as the trial transcript.

### A.      The Procedure

The genesis of this case is a pain relief procedure. As a twenty-two-year-old, Ms. Ramey had a history of painful and persistent urinary tract infections (UTIs). In

an attempt to address this condition, Ms. Ramey's mother, Ylene Larsen, M.D., a pulmonologist, referred her daughter to Dr. Dunne, a urologist with appellee Foxhall Urology.

On January 6, 2003, Ms. Ramey visited Dr. Dunne and received a urethral dilation.[1] The procedure was meant to reduce the incidence of UTIs and painful spasms associated with such infections. Ms. Ramey testified that she experienced "ten out of ten pain" as soon as the procedure began. At the conclusion of the procedure, Ms. Ramey experienced vaginal bleeding. Within hours of leaving the urologist's office, Ms. Ramey became septic and was rushed to hospital. According to a 2013 case report written by Dr. Larsen, Ms. Ramey's discharge papers from January 7, 2003, indicated she was admitted for "E. coli urosepsis following cystoscopy," with no specific mention of the urethral dilation.

## B. Ms. Ramey's Search for Answers

Between her discharge in 2003 and 2017, Ms. Ramey attended over two hundred medical visits with more than ninety doctors, although not all of these visits

---

[1] The procedure requires a physician to insert instruments into the patient in order to stretch their urethra. The patient does not require anesthetization during the procedure.

were necessarily related to symptoms she would later attribute to the January 6, 2003, procedure.

Ms. Ramey's parents were involved in her treatment from the beginning of this period. Dr. Larsen and James Ramey, M.D.—Ms. Ramey's father and an endocrinologist—wrote Ms. Ramey prescriptions and ordered imaging studies. On an unspecified date, Dr. Larsen examined Ms. Ramey's abdomen, heart, and pelvic area. Ms. Ramey testified that Dr. Larsen was "actively involved" with her treatment from 2003 to 2015.[2]

In 2003, many of Ms. Ramey's medical appointments focused on complaints of vaginal and pelvic pain. During those visits, Ms. Ramey underwent various ultrasounds, laparoscopic examinations, MRIs, CT scans, and other procedures that failed to connect her symptoms to the urethral dilation. From 2004 to 2006, Ms. Ramey continued to see other physicians regarding vaginal and pelvic complaints. There is no indication that any of these visits connected Ms. Ramey's ailments to the urethral dilation.

In May 2007, Ms. Ramey wrote an email to announce she was leaving a music band. Therein, Ms. Ramey explained how a doctor had "botched" a urethral dilation

---

[2] The record does not reflect any specific conclusions drawn from any of the examinations ordered or conducted by Ms. Ramey's parents.

performed on her "five years ago," which led to "several, subsequent problems."[3] Ms. Ramey went on to write that

> because [Dr. Dunne] tore a lot of things not meant to tear, because it was never treated properly, because I [had a septic infection near the injury he caused], and because I've basically pretended like nothing was wrong with me for five years – things in that general vicinity have gone into a kind of code red, and are in an alarming amount of pain, all the time, and have been for a year.

Several months later, in December 2007, Ms. Ramey underwent various imaging procedures, including abdominal and pelvic MRIs and CT scans ordered by Dr. Larsen, as well as an abdominal MRI on December 24, 2007. These imaging procedures returned "unremarkable" results. On December 31, 2007, Ms. Ramey emailed another friend about her medical ailments. Ms. Ramey wrote that an unnamed surgeon said there was evidence of adhesions (i.e., scar tissue), although they were "not as strong" as her mother had previously indicated.[4] She added that the doctor thought her "main problems are all in the nerves and all the vag pain / bladder pain / urethral pain . . . is a product of inflamed and damaged nerve endings."

---

[3] The record does not contain any contemporaneous documents produced by physicians supporting the diagnosis of a "botched" urethral dilation.

[4] It is unclear from the record when Dr. Larsen viewed the adhesions and what conclusions she made regarding them.

Visits to physicians throughout 2008 similarly failed to connect Ms. Ramey's symptoms to the urethral dilation. At the end of the year, in December 2008, Ms. Ramey wrote an entry in her journal that "[t]he central problem [of her ongoing pain] is no mystery." Ms. Ramey stated that "my urologist ripped my urethra with a large metal instrument against my will, I became very septic, and I now have this condition called PFD." No contemporaneous documents produced by a physician support this diagnosis. Ms. Ramey testified that she could not remember if she received this diagnosis from a physician or if she self-diagnosed her condition.

That same month, Ms. Ramey emailed a group of friends describing her medical struggles. She wrote that "[t]his all began in 2003 when a urologist performed a small surgery on my urethra – in which he ripped it on purpose with a small metal instrument in order to 'relieve' a persistent UTI." Ms. Ramey attributed her condition to "a collection of bad . . . secondary problems" including fibromyalgia and candida, but she described Dr. Dunne's procedure as "the original trauma."

In 2009, Ms. Ramey prepared a medical history report for a gynecologist. Therein, she wrote that in January 2003, Dr. Dunne "decided to do a urethral dilation" during which he "did much more ripping and damage than he intended to." The medical history further described how Ms. Ramey "saw the east coast's best Rheumatologists, Urologists, Gynecologists, Uro-gynecologists, Neurologists,

Infectious Disease doctors, cardiologists, GI doctors, and Proctologists" over the seven months following the procedure. Ms. Ramey concluded the history by noting she was "diagnosed with severe pelvic floor dysfunction, severe interstitial cystitis, . . . Candida, Fibromyalgia, . . . and possibly some larger auto-immune disease."

A medical report dated April 10, 2010, and created with Ms. Ramey's input indicates she had "severe pelvic floor dysfunction with abdominal spasm" with an eight-year history of problems. The report goes on to state that Ms. Ramey received treatment "with urethral dialation [sic]," the "procedure failed and [Ms. Ramey] had septic shock with hospitalizatioin [sic] and problems progressed since then."[5] Ms. Ramey visited various physicians in 2010, none of whom established a plausible link between her symptoms and the urethral dilation.

Sometime in 2012, Dr. Larsen wrote a document describing her "conclusions from all the available history, exams and database" concerning Ms. Ramey's physical condition.[6] Dr. Larsen indicated that it was "likely that the [second through fourth passes during the urethral dilation] went through the crease of the left introits

---

[5] Ms. Ramey testified that she did not recall whether she told the physician who prepared this report that the urethral dilation was a "failed procedure," but she did agree that the description of a "failed procedure" aligned with her view that the urethral dilation was "botched."

[6] The report is not dated. During a deposition, Dr. Larsen confirmed that it was created in 2012.

to the vagina slightly below the urethra." She diagnosed Ms. Ramey with an iatrogenic injury (i.e., one caused by medical treatment) to the pudendal nerve "coincident with the procedure."

On February 20, 2013, Ms. Ramey wrote an email to a group of friends explaining that she suffered from a variety of ailments due to "a very unfortunate surgery" in which her urologist "mistakenly ripped through the urethra, through the vaginal wall, and through the wall of the colon."[7] In a March 6, 2013, email, Ms. Ramey wrote that her health problems "all began . . . with a very horrifying, botched outpatient surgery on my urethra . . . [during which a medical] instrument tore through the urethra, vaginal wall, and into the colon."

Dr. Larsen produced another case history dated July 16, 2013. Therein, she wrote that Ms. Ramey "sustained a surgical injury in 2003 to the left vaginal wall, bladder, rectum, and pudendal nerve." This case report went through a few iterations, two of which are dated August 30, 2013. The latest version is dated November 7, 2013, and describes "an extensive surgical injury to the left perivaginal tissue, rectosigmoid junction, and pudendal nerve [which] occurred during an attempted urethral dilation." Dr. Larsen concluded that "subsequent history fits best

---

[7] When questioned about this document, Ms. Ramey confirmed that it was her understanding that tearing through the vaginal wall and urethra into the colon would have been "improper and incorrect care."

with a rare recto-periurethral fistula disrupted" by the attempted urethral dilation. Dr. Ramey included an addendum to the final version of the report in which he concluded that "[t]he most plausible explanation for [Ms. Ramey's] problem is that the original [urethral dilation] produced a fistula from the colon or bladder to the periurethral area."

In March 2014, a different James Ramey—Ms. Ramey's brother and a comparative literature professor—emailed a Mayo Clinic physician, writing that his father suspected Ms. Ramey may suffer from complex regional pain syndrome (CRPS) "that was set off by [a] botched urethral dilation in 2003." He added that "Dr. Goodman also thought this is feasible." "Dr. Goodman" appears to refer to Brent Goodman, M.D., a neurologist at the Mayo Clinic. Then, on May 5, 2014, Ms. Ramey sent an email to a potential new internist, seeking treatment for a suite of conditions that arose "[f]ollowing a botched urethral dilation that resulted in septic shock in 2003." She added that "[i]t is unclear what mistake [Dr. Dunne] made—different doctors have suggested that he may have ripped all the way through the vagina into the rectum and created a small fistula, or he may have nicked a nerve, or he may have missed the urethra all together."

Ms. Ramey continued to visit numerous doctors in 2014 and through the end of 2016. There is no evidence that these physicians connected the urethral dilation

to Ms. Ramey's ailments, although Ms. Ramey herself continued to report the linkage.

Then, on August 31, 2016, Ms. Ramey received an email from Richard Marvel, M.D.—a gynecologist and pain medicine doctor—suggesting that Ms. Ramey's symptoms could be caused by a neuroma. Ms. Ramey conducted research of her own and determined that the clinical presentation of neuroma was similar to the symptoms she was experiencing. Dr. Marvel recommended that Ms. Ramey visit specialists at the Pelvic Pain Center, including Dr. Mario Castellanos, a gynecologic surgeon.

In July 2017, Ms. Ramey visited Dr. Castellanos, who conducted a transvaginal ultrasound and identified a "big mass" of scar tissue. During the procedure, Dr. Castellanos "pressed" the mass and Ms. Ramey "all but leapt off the table," leading him to conclude that he had identified "the root of [Ms. Ramey's] pain." After the procedure, Dr. Castellanos indicated that the source of pain could be neuroma, scar tissue, or, in Ms. Ramey's words, "a number of things."

Ms. Ramey then visited Dr. Lee Arnold Dellon, a peripheral nerve surgeon, to undergo a procedure on the mass identified by Dr. Castellanos. Dr. Dellon excised the mass and resected at least one nerve to reduce Ms. Ramey's pain. A subsequent pathological report on the mass concluded that it was "fibrous tissue and

scarring." This report indicated that there was no presence of a neuroma. Ms. Ramey alleges that Dr. Dellon "concluded that the scarring and neuromas were likely caused by [the] urethral dilation procedure which had damaged her labia, vestibule, and the surrounding nerves."[8]

Two years later, on August 30, 2019, Ms. Ramey sued appellees. She testified that she chose to initiate the suit at this time because the mass identified and examined by Drs. Castellanos and Dellon provided "actual evidence that corresponded with the hypothesis that had been offered to me" (i.e., that the urethral dilation caused her injury).

## C.    The Litigation

### 1.    Appellees' waiver of inquiry notice arguments

Prior to the first part of a bifurcated trial,[9] Ms. Ramey moved for permission to present statements by appellees' experts that there was little if any medical

---

[8] Dr. Dellon's medical opinion regarding the source of the mass is subject to some debate. Ms. Ramey's complaint includes the above-quoted language. However, in a bench conference outside of the jury's hearing, appellees' counsel indicated that Dr. Dellon's opinion was "crystal clear" during his deposition that he had not definitively concluded the urethral dilation was the cause of the mass. The deposition transcript was not in evidence and is not included in the record on appeal.

[9] Twice before trial, appellees moved for summary judgment on the basis that Ms. Ramey's claims were time-barred. The trial court denied both motions, finding that genuine issues of fact existed as to whether Ms. Ramey (1) knew the urethral dilation caused her adverse symptoms and (2) had evidence of wrongdoing

evidence to support her theory of harm. Introduction of such evidence could illustrate that the state of medical science precluded Ms. Ramey from discovering the cause of her injury until July 2017. The trial court denied the motion, finding the statements of appellees' experts did not pertain to what Ms. Ramey knew about the potential cause of her injury or when she knew it. Ms. Ramey moved for reconsideration, arguing the statements were relevant not to her actual knowledge of the injury but rather to her constructive knowledge of it, which could constitute an inquiry notice trigger of the statute of limitations.

At a hearing on the motion, appellees' counsel indicated inquiry notice was "not going to be the focus" of their case during the statute of limitations trial. Appellees' counsel continued, representing that the key inquiry would be "when [Ms. Ramey should] have acted on [her knowledge and] filed a lawsuit." The trial court suggested the motion could be mooted by a proffer from appellees that they would make arguments based only on actual notice as opposed to inquiry notice. Appellees' counsel indicated they "could consider a proffer on that," adding that their case was "focus[ed]" on actual notice. The trial court then denied Ms. Ramey's

---

supported by a physician's expertise. In light of these rulings, appellees requested the trial be bifurcated so the jury could determine whether Ms. Ramey's claims were time-barred before assessing appellees' liability. The trial court granted the motion, observing that a single trial would require the defense to simultaneously "advance two contradictory dispositive theories" (i.e., that Ms. Ramey had sufficient notice to bring the suit and that Ms. Ramey could not bring a viable suit).

motion for reconsideration as moot as the proceedings would focus on "what should [Ms. Ramey] have done with what she knew" rather than focusing "on what else could she have done."

The issue reappeared during appellees' rebuttal closing argument. There, appellees' counsel set forth a hypothetical timeline of Ms. Ramey's investigation into a potential claim:

> So what happens is Ms. Ramey walks into the lawyer's office, brings her [medical] records, brings the statement of all of these doctors that she then remembers who feel that there's an issue with the care that caused her injury . . . .
>
> The lawyer then goes out and . . . does [an] investigation. And Ms. Ramey has told [the lawyer] I'd like to have a vaginal – an ultrasound done but I haven't been able to get a doctor to do it. Okay. Well, I'm a lawyer; we have experts and we can get this done.
>
> The whole purpose of [getting a lawyer] isn't that they're just going to file a lawsuit the second they walk in the door. They investigate it.
>
> They send the client to doctors to have them evaluate[d]. . . . So let's go into this. So Dr. Iglesia comes in and says, here's what my thought is. At this point in time, we haven't found it, the eureka moment, but I think she should get a vaginal ultrasound under anesthesia . . . . The doctors have been reticent to do it, so the lawyers say, we'll get it done. That's not a problem. So they investigate it, they do the ultrasound. And wait a second, the eureka moment isn't in 2019. It's not in 2018, '17, '16.

It is from 2007 [ ] within the statute of limitations. She's
got an answer and she's got a viable lawsuit.

Ms. Ramey's counsel objected, arguing appellees' counsel was "introducing inquiry notice arguments that he waived" by contending that "if [Ms. Ramey] did more, she would have found more information." Counsel also requested that "the whole rebuttal argument" be stricken from the record. He suggested "it's totally fine for [appellees' counsel] to say if [Ms. Ramey had] called a lawyer, the lawyer would have gotten the existing medical records," but it was problematic to suggest that attorney "would have then gotten the medical evidence from a doctor who previously refused to [conduct the contemplated procedure]." On this basis, counsel requested sur-rebuttal, which the trial court denied. The court concluded the colloquy by determining that Ms. Ramey's counsel was "making a lot more of this than what I'm hearing."

The trial court then addressed the jury, instructing them "the issue for the jury to decide is what Ms. Ramey knew of her injury, the cause of her injury and of some evidence of wrongdoing by the defendants, and not anything she may have learned after she filed the lawsuit."

## 2. Jury instructions on the causation element of the discovery rule

The jury instructions relating to the discovery rule were a point of contention throughout the litigation. In a joint pretrial statement, Ms. Ramey proposed instructions indicating that patients who seek medical care must "rely on their physicians' expertise in determining the cause of" an actionable problem. Her proposed instructions also stated that "a person cannot fairly be expected or required to [file suit] until it is reasonable – under all of the circumstances." According to the proposed instructions, a statement from a medical provider that it was "merely possible that Ms. Ramey's condition was caused by the urethral dilation would be insufficient" to trigger the statute of limitations. Rather, the statute of limitations would not begin to run "until the plaintiff receives some medical opinion that specifically identifies the wrongdoing of the defendant to be included among the 'plausible' (not merely possible) causes of her maladies." The proposed instructions further indicated that the jury "may consider factors such as whether [Ms. Ramey's] attempts to determine the cause of her condition were rejected by other medical providers" or whether she "reasonably relied on statements" from physicians "discounting the plausibility that the urethral dilation caused" her injury. Finally, the proposed instructions directed that "the answer to the question *when* Ms. Ramey reasonably should have discovered the urethral dilation procedure was a plausible

cause of her subsequent maladies . . . requires an analysis that considers all of the relevant circumstances."

The trial court ultimately rejected the proposed instructions as "too much." Instead, the trial court offered an outline of potential instructions based on the rule statement presented in *Brin v. S.E.W. Invs.*, 902 A.2d 784 (D.C. 2006).

The issue reappeared during appellees' opening. Appellees' counsel stated that the statute of limitations began to run "when the patient is aware of injury possibly caused by a physician's negligence." Ms. Ramey's counsel objected that this was a misstatement of law. The trial court overruled the objection and reminded the jury that "statements of counsel are not evidence." Later in opening, appellees' counsel said, "[w]hat you need is some evidence of improper care and opinion—any opinion of wrongdoing or a whiff of negligent conduct." Ms. Ramey's counsel again objected. The trial court did not explicitly rule on the objection, nor did it address the issue to the jury. The court did, however, indicate that it disagreed with appellees' description of the law and suggested that Ms. Ramey would have an opportunity to address the issue during closing.

At the conclusion of trial, during appellees' closing, counsel stated the statute of limitations "starts with basically two things; some evidence of wrongdoing by Dr. Dunne and some injury from that wrongdoing." Ms. Ramey's counsel again

objected that this was a misstatement of law. The trial court overruled the objection.[10] Throughout the remainder of appellees' closing arguments, counsel described the causation element of the discovery rule in terms of possibility and potentiality, but never plausibility.[11]

At the charging conference, appellees' counsel proposed instructions that indicated the link between wrongdoing and injury need only be "a possibility among other possibilities." Ms. Ramey's counsel opposed the use of "possible," insisting the causal link must be "reasonably possible" or "plausible." Therein followed a discussion in which the trial court repeatedly observed that *Brin* uses the terms "plausible cause" and "possible cause" "interchangeably." The parties agreed to instructions that required a "plausible [causal] linkage," but also required the alleged

---

[10] Ms. Ramey was not afforded an opportunity to explain her objection at trial. In briefings before this court, Ms. Ramey clarified that appellees' counsel purportedly misstated the law by omitting the causation element of the discovery rule.

[11] Appellees' counsel made several statements concerning the causation standard, including the following: "[a]ll that is needed is some or any injury from wrongdoing, not a precise diagnosis . . . [o]nly possible causes, not a diagnosis"; "you don't need to have all aspects of the negligent care, you need evidence of improper care. You need opinions – any opinions of wrongdoing"; "[i]t doesn't even have to be the probable or certain or likely cause, just a potential. It can still have other possible causes"; "[t]he bottom line is that in real time, numerous [other physicians] advised Ms. Ramey consistently about the potential of wrongdoing, wrongful conduct"; and "[t]he only issue here . . . is when was Ms. Ramey aware of the injury possibly caused by Dr. Dunne's negligence."

wrongdoing "to be included among the reasonably possible causes" of Ms. Ramey's injury.[12]

The instructions ultimately delivered to the jury read as follows:

> Here, the three-year period to the deadline for Ms. Ramey's claim started when she knew, one, of her injury; two, the cause of her injury; and three, of some evidence of wrongdoing by the defendants.
>
> For Ms. Ramey to have knowledge of the injury, it is not necessary that all or even the greater part of Ms. Ramey's damages have to occur before her claim arises. Any appreciable and actual harm flowing from the defendant's negligent conduct establishes a cause of action.
>
> In deciding whether Ms. Ramey knew of the reasonable possible cause of her injury, she is not responsible for diagnosing her own injury, but must rely on the expertise of her medical care providers to determine the reasonably possible cause of her condition.
>
> Since patients must rely on their doctors, a person cannot reasonably be expected or required to act until that person has some medical advice to support a plausible linkage between a known injury and wrongdoing, of which the person has some evidence.
>
> On the other hand, while mere suspicion cannot supply that plausible linkage, the medical advice need not show a linkage to a reasonable medical certainty. A medical opinion that the wrongdoing is a plausible cause of the known injuries will trigger the running of the statute of

---

[12] Ms. Ramey insists that, "[h]aving been forced to fight so hard for the bare minimum instruction," her counsel declined to re-argue the proposed instructions to assess the causal link based upon the totality of the circumstances.

limitations, just as is the case with some evidence of wrongdoing.

For Ms. Ramey to have plausible cause, she would have to have received medical advice that specifically identifies the alleged wrongdoing of the defendants to be included among the reasonably possible causes of her maladies.

For Ms. Ramey to have some evidence of wrongdoing, Ms. Ramey need not have knowledge of the precise breadth or nature of the injurious action. In other words, was the totality of Ms. Ramey's knowledge sufficient to put her on notice of her claim against the defendants.

3.       **Motion for judgment as a matter of law and motion for a new trial**

At the conclusion of the statute of limitations trial, the jury returned a verdict in favor of appellees. Shortly thereafter, Ms. Ramey filed a motion for judgment as a matter of law, or alternatively, for a new trial. In a thorough order, the trial court denied Ms. Ramey's motion.

Ms. Ramey's motion for judgment as a matter of law turned on whether appellees met their burden of proof to demonstrate that Dr. Dunne's conduct was among the reasonably possible causes of Ms. Ramey's injuries. After a detailed analysis of the discovery rule as enunciated in *Brin*, the court reviewed the rule's application to Ms. Ramey's case. The trial court noted that the jury received evidence upon which it could reasonably find the opinions of Ms. Ramey's parents—Drs. Larsen and Ramey—constituted medical opinions that the urethral

dilation was a plausible cause of Ms. Ramey's injuries. The trial court then examined the evidence in which Drs. Larsen and Ramey "consistently cited the urethral dilation as a cause of Ms. Ramey's symptoms." The court noted there was no evidence that Ms. Ramey "profoundly" disagreed with the medical conclusions of her parents; rather, Ms. Ramey "consistently embraced her parents' medical opinion that the urethral dilation was the source of her symptoms," thus illustrating her knowledge of those opinions. The trial court then identified numerous instances of Ms. Ramey presenting the medical conclusions of her parents to other physicians as "valid medical opinion[s]." On this basis, the trial court concluded there was sufficient evidence for the jury to find Ms. Ramey received medical opinions from qualified physicians that the urethral dilation was "a plausible cause" of her injuries.[13] The trial court did not make an explicit finding as to when the statute of limitations began running. Instead, the court presented a litany of documents dating from 2012 to 2014 representing evidence the jury could have used to conclude Ms. Ramey received a triggering medical opinion. The court therefore denied Ms. Ramey's motion for judgment as a matter of law.

---

[13] The trial court noted that while Drs. Larsen and Ramey "are not specialists in the fields that relate to [Ms. Ramey's] injuries, the jury heard evidence of their diligence . . . in determining the cause of Ms. Ramey's issues." "Thus, it was for the jury to decide the appropriate weight to give the medical opinions that they were presented in both the testimony and the medical records in determining" when Ms. Ramey had the requisite knowledge to bring her claim.

Turning to the motion for a new trial, Ms. Ramey raised three arguments. First, she contended the jury instructions failed to direct the jury to determine whether the time at which Ms. Ramey filed suit was reasonable under all of the relevant circumstances. Next, Ms. Ramey argued appellees' counsel misstated the law in opening and closing arguments by conflating the terms "potential," "suspected," and "possible" with "plausible" and "reasonably possible." Finally, Ms. Ramey argued the trial court incorrectly denied her motion to enter appellees' expert depositions into evidence. The trial court rejected all three of these arguments. The trial court also rejected Ms. Ramey's argument that appellees' counsel raised an inquiry notice argument during rebuttal closing. In so doing, the court observed that, (1) the purportedly prejudicial statements (i.e., the hypothetical timeline of Ms. Ramey's investigation) were responses to an argument Ms. Ramey's counsel raised at closing, and (2) the trial court had presented the jury with directions about how to interpret the challenged statements. This appeal followed.

## II. Discussion

### a. Denial of the Motion for Judgment as a Matter of Law

We first assess whether the trial court erred in denying Ms. Ramey's motion for judgment as a matter of law. Denial of that motion was predicated on the conclusion that a reasonable factfinder could conclude that Ms. Ramey possessed

evidence sufficient to show that Dr. Dunne's urethral dilation caused Ms. Ramey's symptoms within the limitations period.

### i.  Assessing motions for judgment as a matter of law

We review motions for judgment as a matter of law de novo by applying the same standard as the trial court. *Washington Nat'ls Stadium, LLC v. Arenas, Parks & Stadium Sols., Inc.*, 192 A.3d 581, 586 (D.C. 2018). Courts may grant a motion for judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Super. Ct. Civ. R. 50(a)(1). This requires a finding that "no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor." *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 354 (D.C. 2015) (quoting *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 902 (D.C. 2008)).

"[A]s long as there is some evidence from which jurors could find that the [prevailing] party has met its burden, a trial judge must not grant [a motion for judgment as a matter of law]." *Ishakwue v. District of Columbia*, 278 A.3d 696, 706 (D.C. 2022) (alteration in original) (quoting *Sullivan*, 112 A.3d at 354). "[I]f it is possible to derive conflicting inferences from the evidence, the trial judge should" deny the motion. *Sullivan*, 112 A.3d at 354 (quoting *Majeska v. District of*

*Columbia*, 812 A.2d 948, 950 (D.C. 2002)). "Irrespective of which conclusion a jury might reach, the fact that more than one conclusion, material to the outcome of the case, might reasonably be drawn from the evidence demonstrates that" the motion should be denied. *Abebe v. Benitez*, 667 A.2d 834, 836 (D.C. 1995). Movants thus face a high hurdle, as motions for judgment as a matter of law are appropriate only in extreme cases. *See Rivera v. Schlick*, 887 A.2d 492, 496 (D.C. 2005) (quoting *Oxendine v. Merrell Dow Pharms., Inc.*, 506 A.2d 1100, 1103 (D.C. 1986)).

### ii. Interpreting the discovery rule in *Brin*

Generally, a claim accrues for statute of limitations purposes when an injury occurs. *Santos v. George Washington Univ. Hosp.*, 980 A.2d 1070, 1074 (D.C. 2009). If the relationship between the injury and the alleged tortious conduct is unclear, we apply the discovery rule to determine when the claim accrues. *Doe v. Medlantic Health Care Grp.*, 814 A.2d 939, 945 (D.C. 2003). The discovery rule provides that the cause of action accrues when the plaintiff knows, or by the exercise of reasonable diligence should know, of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *Brin*, 902 A.2d at 792. *Brin* is the lead case in this jurisdiction concerning the discovery rule and thus merits close inspection.

*Brin* sets forth two distinct inquiries guiding the overall discovery rule analysis. First, courts must determine "what facts are sufficient to trigger the obligation to make a reasonable investigation into the possible existence of a cause of action," meaning what facts are sufficient to put the plaintiff on inquiry notice. *Id.* at 794. Second, courts assess what knowledge, whether actual or based on inquiry notice, a plaintiff must have about the existence of a cause of action to trigger the statute of limitations. *Id.* In other words, the second inquiry determines when a cause of action accrues based upon when the plaintiff has sufficient knowledge.

It is clear from *Brin* that the discovery rule may be triggered by either actual knowledge or "inquiry knowledge." *Id.* Inquiry knowledge is present when the plaintiff is on "inquiry notice," meaning there are facts sufficient to trigger the plaintiff's "obligation to make a reasonable investigation into the possible existence of a cause of action." *Id.* This is to say a plaintiff is charged with "knowledge that [s]he does not actually have but which [s]he would have discovered had [s]he exercised reasonable diligence in acting on the information available to [her]." *Id.*

"'[W]hat constitutes the accrual of a cause of action is a question of law,'" but "'when accrual actually occurred in a particular case is a question of fact' to be resolved by the fact-finder." *Id.* at 795 (quoting *Diamon v. Davis*, 680 A.2d 364, 370 (D.C. 1996)). "[This] inquiry is highly fact-bound and requires an evaluation

of all of the plaintiff's circumstances." *Id.* (quoting *Diamond*, 680 A.2d at 372). Accordingly, the finder of fact must decide the issue of when accrual occurs "[u]nless the evidence regarding [accrual] is so clear that the court can rule on the issue as a matter of law." *Id.* at 795 (first alteration in original) (quoting *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 892 n.29 (D.C. 2003)). The jury must "resolve any disputed facts relevant to the determination of the accrual of the statute of limitations," including "the reasonableness of the plaintiff's actions or inactions in light of what may be otherwise undisputed basic facts." *Id.* at 800. "What is 'reasonable under the circumstances' is a highly factual analysis." *Id.* at 800-01 (quoting *Diamond*, 680 A.2d at 372).

Turning to the "cause in fact" element—the second element—of the discovery rule, the *Brin* court indicated that "a person cannot reasonably be expected or required to act until that person has some medical advice to support a linkage between a known injury and wrongdoing of which [they have] some evidence."[14] *Id.* "[A] medical opinion that the wrongdoing is a plausible cause of the known

---

[14] It should be noted that the "general principles requiring knowledge of some evidence of wrongdoing" informed the *Brin* court's approach to the causal linkage element. *Id.* at 793. One of these principles is that "the plaintiff need not have knowledge of the precise breadth or nature of the tortious action.'' *Id.* at 792. Another is that "the quantum of knowledge sufficient to put one on notice of her claims against another varies from case to case," so the standard for what constitutes "some evidence of wrongdoing" is not precise. *Id.* at 793.

injuries will trigger the running of the statute of limitations." *Brin*, 902 A.2d at 794. This is in part because "one who knows that [s]he has suffered from medical malpractice may not postpone an action until the full extent of [her] damage is ascertained." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C. 1994) (alterations in original) (quoting *Hulver v. United States*, 562 F.2d 1132, 1137 (8th Cir. 1977)).

The *Brin* court specified that the phrase "plausible cause" "contemplate[s] that the plaintiff will have received medical advice that specifically identifies the wrongdoing of the defendant . . . among the reasonably possible causes of her maladies." [15] *Brin*, 902 A.2d at 794. At the time the wrongdoing is determined to be a plausible cause, there does not need to be a reasonable degree of medical certainty that the defendant's conduct is "more likely than anything else" to have been a cause of the injuries. *Id.* (quoting *Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 929 n.4 (D.C. 2003)). As a result, the *Brin* court was careful to emphasize that this standard is "far from a precise one." *Id.* (quoting *Diamond v. Davis*, 680 A.2d 364, 380 (D.C. 1996)).

---

[15] The use of the terms "plausible" and "reasonably possible" was intentional. The phrase "reasonably probable" would "too closely approximate [the] normally applicable standard of ultimate proof required of the plaintiff . . . without regard to the further amplification that, for example, discovery might unearth." *Brin*, 902 A.2d at 794.

It is axiomatic that determining whether a plaintiff has knowledge of a causal linkage implicates what a plaintiff knows and thinks. The *Brin* court recognized this, observing that plaintiffs in favorably cited cases from other jurisdictions had "significant suspicion[s]" that their injuries resulted from the acts of defendants, but did not bring suit until medical evidence established a plausible causal link. *Id.* at 796. "A hunch or a belief that is not presently supportable does not constitute the kind of knowledge that charges a possible plaintiff with the immediate duty to commence an action." *Id.* (quoting *Borello v. U.S. Oil Co.*, 388 NW.2d 140, 146 n.5 (Wis. 1986)); *see also id.* at 798 ("[A] plaintiff's mere suspicion or speculation that another's product caused the injuries is insufficient to trigger the statute . . . ." (quoting *Degussa Corp. v. Mullens*, 744 N.E.2d 407, 411 (Ind. 2001))). Similarly, a plaintiff's suspicions of a causal linkage between her injuries and a defendant's conduct—even if those suspicions were presented to physicians—do not constitute knowledge absent "reasonable medical information." *Id.* at 797 (quoting *Vispisiano v. Ashland Chem. Co.*, 527 A.2d 66, 75-76 (N.J. 1987)). Rather, "a physician's opinion regarding causation puts a plaintiff on notice"—and thus is sufficient to constitute knowledge—if the opinion is not "neutral, ambiguous, hypothetical or phrased in terms of mere possibility." *Id.* at 799 (quoting *Helinski v. Appleton Papers*, 952 F. Supp. 266, 271 (D. Md. 1997)).

In short, *Brin* counsels that the causal linkage element of the discovery rule is satisfied when the plaintiff receives plausible medical advice that specifically identifies the defendant's conduct as a reasonably possible cause of her injuries. Whether or not the advice is plausible is a fact-intensive determination in which the factfinder must assess the circumstances surrounding the advice, including the presence of reasonable medical information.

### iii.      Applying the discovery rule

Here, a reasonable juror, viewing the evidence in the light most favorable to appellees, could have reached the conclusion that the statute of limitations had expired prior to Ms. Ramey filing suit.

As early as 2012, Dr. Larsen created documents indicating that the urethral dilation was a plausible cause of Ms. Ramey's injury. In a report from that year, Dr. Larsen wrote that, during the procedure, an instrument "went through the crease of the left introits to the vagina slightly below the urethra," resulting in "[p]udenal nerve injury." Ms. Ramey signaled her knowledge of the diagnosis in a February 20, 2013, email that attributed her ailments to "a procedure on [her] urethra—which mistakenly ripped through the urethra, through the vaginal wall, and through the wall of the colon." Ms. Ramey reiterated her knowledge of Dr. Larsen's diagnosis in a March 6, 2013, email. Then, on May 5, 2014, Ms. Ramey wrote in an email to a

physician that "different doctors" had suggested Dr. Dunne conducted "a botched urethral dilation" and he "may have ripped all the way through the vagina into the rectum and created a small fistula, or he may have nicked a nerve, or he may have missed the urethra all together." By this date, Dr. Ramey had also opined on the causal linkage between Ms. Ramey's injuries and the urethral dilation. Later in time, on March 1, 2016, Ms. Ramey completed another medical history intake form where she wrote that while her doctors did not "actually know what exactly went wrong" during the urethral dilation, some believed Dr. Dunne "damaged a nerve or nerve plexus, . . . and others [thought] maybe he created a small fistula." She also wrote that "[t]he operating theory of the case is that the damage from the surgery and the ongoing pain and stress, in conjunction with [the treatment she received from the subsequent sepsis] is what caused/is causing the HPA axis dysregulation and the dysbiosis."

Consequently, there is evidence that as early as 2012 and as late as March 2016, Ms. Ramey received medical advice that established a plausible causal linkage between the 2003 urethral dilation and her injuries. This advice was predicated on both the examinations conducted by Dr. Larsen herself and the multitude of exams administered by other physicians. In light of this advice, a reasonable juror could conclude that Ms. Ramey had actual knowledge of the cause in fact of her injury based upon reasonable medical information. Ms. Ramey

therefore had sufficient information to file a complaint plausibly alleging Dr. Dunne caused an iatrogenic injury resulting in a fistula and/or nerve damage. Furthermore, armed with this information, Ms. Ramey could have sought further advice to flesh out the causal issue for litigation. This is precisely the course of action the *Brin* court envisioned plaintiffs would take after receiving advice sufficient to accrue a cause of action. *See Brin*, 902 A.2d at 794 ("[W]ith some medical opinion that the perceived evidence of wrongdoing is a plausible cause of the illness, the plaintiff can be expected to promptly seek additional medical and legal advice to illuminate the causal issue.").

Accepting the evidence of the advice presented by Ms. Ramey's parents as true, the statute of limitations would have terminated on March 1, 2019, at the latest. The instant suit was filed on August 30, 2019. Consequently, there is sufficient evidence for a reasonable jury to find that appellees met their burden to show that Ms. Ramey failed to timely file her suit.

In order to reach this conclusion, Ms. Ramey's parents, Drs. Larsen and Ramey, must be capable of rendering medical opinions sufficient to trigger the discovery rule. Ms. Ramey insists that no reasonable juror would believe that her parents were qualified to render advice on the potential causes of her symptoms because their areas of expertise are unrelated to her conditions. However, there is

nothing in *Brin* that requires triggering medical advice to come from a specialist physician. *See Brin*, 902 A.2d at 791(discussing medical opinion of physician without mentioning a requirement that the physician be a specialist). This is in accord with our precedent regarding medical experts in medical malpractice cases. *See, e.g., Snyder v. George Washington Univ.*, 890 A.2d 237, 246 n.6 (D.C. 2006) ("[T]his court has firmly rejected the position that an expert must be a member of the same specialty as defendant doctors in order to testify as an expert.").

We conclude that the discovery rule does not require that triggering medical advice come from a specialist. Instead, all that *Brin* requires of triggering advice is that the causal linkage be "plausible" or "reasonably plausible." This language clearly evokes the familiar plausibility standard required to survive a motion to dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The discovery rule's plausibility/reasonable possibility requirement ensures that a claim does not accrue until a claim may be stated. Consequently, the requirement ensures that patently unfounded medical advice is insufficient to accrue a cause of action. To posit an extreme hypothetical, the plausibility requirement prevents a cause of action from accruing if a physician advises a potential plaintiff that their mesothelioma was

caused by a paper cut. Rather, the requirement means that a medical opinion cannot start the statute of limitations clock unless it passes medical—and thus legal—muster.

Ultimately, the inquiry turns on the sufficiency of the medical opinion, not on which physician rendered the opinion.[16] Although the medical opinion of a specialist may be more apt to present a plausible medical opinion, the sufficiency of a specialist's opinion is determined on a case-by-case basis; the discovery rule does not automatically render specialist opinions sufficient or superior to the opinions of other physicians. A general practitioner may present a triggering medical opinion just as well as a specialist. Similarly, a physician does not need to be the putative plaintiff's primary care doctor to render a sufficient opinion. In short, it is the substance of the advice—not the title of the advising physician—that is relevant to

---

[16] None of the cases from other jurisdictions that were approvingly cited by the *Brin* court require that a physician have specific qualification or training to render a sufficient medical opinion. *See generally Borello*, 388 N.W.2d at 413 (discussing sufficiency of medical opinion necessary to trigger discovery rule without requiring such opinion be rendered by specialist); *Vispasiano*, 527 A.2d 66 (same); *Degussa Corp.*, 744 N.E.2d 407 (same); *Helinski*, 952 F. Supp. 266 (same). The *Degussa* court endorsed the approach that any doctor could provide the triggering diagnosis, leaving lingering questions to be resolved by subsequent consultation with specialists. *See Degussa Corp.*, 744 N.E.2d at 411 ("When a doctor [informs a potential plaintiff of a plausible causal linkage], the plaintiff is deemed to have sufficient information [to] seek 'additional medical or legal advice needed to resolve any remaining uncertainty or confusion' regarding the cause of his or her injuries . . . ." (quoting *Van Dusen v. Stotts*, 712 N.E.2d 491, 499 (Ind. 1999))).

the discovery rule analysis. The fact that various physicians can render a sufficient medical opinion is precisely why the determination of when the cause of action accrues is left to the finder of fact. In determining whether a medical opinion is sufficient, the factfinder is entitled to consider the circumstances of that advice, including the opining physician's training and history with the plaintiff.

The underlying purpose of the discovery rule confirms this conclusion. The rule applies when "the relationship between the fact of injury and the alleged tortious conduct [is] obscure." *Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298-99 (D.C. 2001). Requiring potential plaintiffs to receive a medical opinion from a specialized doctor reduces the number of physicians that can provide advice and thus makes it harder for injured patients to seek legal redress. Presumptively allowing generally qualified physicians to render opinions, on the other hand, makes it easier for suffering patients to make themselves whole. The very fact that the discovery rule only applies when the causal linkage is "obscure" counsels in favor of allowing the opinions of more, not fewer, physicians to support a cause of action.

Of course, there may be cases where a causal linkage is plausible (and therefore sufficient to accrue a cause of action) yet incapable of being proven to a reasonable degree of medical certainty due to technological limitations. In this scenario, the plaintiff must either file a doomed lawsuit or wait until medical

technology can prove the causal link, a development which may not occur until after the limitations period. One would strain to call this situation fair to the plaintiff. Even so, the discovery rule charges factfinders to determine when a plausible causal connection is established and nothing more. The *Brin* court made clear that the discovery rule is designed to "not give a plaintiff *carte blanche* to defer legal action indefinitely." *Brin*, 902 A.2d at 794. Rather, the discovery rule gives a plaintiff time to identify a plausible causal connection and then seek further information after a suit is initiated, including "details of the wrongdoing" that could be obtained in discovery. *Id.* This balances the interests of the plaintiff with those of the defendant, who cannot reasonably be subjected to untimely lawsuits. As much as the plaintiff is entitled to be made whole, so too the would-be defendant is entitled to be free from unfairly delayed legal action. The discovery rule attempts to balance these competing interests.

Relatedly, Ms. Ramey contends that, as a matter of policy, courts should be hesitant to permit inferences about the objective reliability of the medical opinions of one's parents. While medical ethics discourage physicians from treating immediate family members, such treatment is not ethically precluded. Am. Med. Assoc. Code of Ethics Op. 1.2.1 (2022), https://code-medical-ethics.ama-assn.org/sites/amacoedb/files/2022-08/1.2.1.pdf; https://perma.cc/LAD2-ULN7. As with all other aspects of the discovery rule, the factfinder is properly empowered

to weigh the evidence—including whether to infer the medical opinion of a family member-physician is reliable—in determining when a cause of action accrues. Consequently, we decline to impose limitations as a matter of law on the factfinder's ability to make such an inference on the basis of a physician's relationship to the plaintiff.

Ms. Ramey also argues that, in denying her motion, the trial court erroneously relied on "the strength of [her] subjective belief[]" in the medical opinions of her parents. The trial court did indeed find that "the jury heard evidence that [Ms. Ramey] consistently embraced her parents' medical opinion that the urethral dilation was the source of her symptoms." This finding alone would be insufficient to deny Ms. Ramey's motion, as the discovery rule does not turn on the subjective belief of the potential plaintiff. Although it was error for the trial court to seemingly account for Ms. Ramey's subjective belief as legally sufficient in and of itself,[17] the error was harmless. As discussed *supra*, there was a legally sufficient evidentiary basis for the court to deny the motion based upon Ms. Ramey's receipt of her parents' medical opinions; receiving those opinions does not necessarily implicate

---

[17] To be clear, it is appropriate to use evidence of Ms. Ramey's subjective belief in a medical opinion to illustrate her knowledge of that opinion.

Ms. Ramey's subjective beliefs, but it does necessarily implicate her knowledge. This represents a legally sufficient independent basis to deny the motion.

For these reasons, we hold that a reasonable jury could have concluded that Ms. Ramey failed to file her suit before the statute of limitations expired. Therefore, the trial court did not err when it denied Ms. Ramey's motion for judgment as a matter of law.

**b.      The Discovery Rule's Causal Linkage Analysis in the Jury Instructions**

We next determine whether the trial court erred in denying Ms. Ramey's motion for a new trial relating to the propriety of the discovery rule standard presented in the jury instructions.

In short, Ms. Ramey's counsel affirmatively assented to the final jury instructions. Ms. Ramey thus waived any claim of instructional error. *See Masika v. United States*, 263 A.3d 1070, 1077 (D.C. 2021) ("Counsel for appellant did not merely fail to object to the instruction, but rather affirmatively agreed to [it]. Therefore, we hold that appellant waived this claim of instructional error.").[18]

---

[18] Ms. Ramey argues that she did not waive this claim because the invited error doctrine "'precludes a party from asserting as error on appeal a course that [they have] induced the trial court to take.'" *Young v. United States*, 305 A.3d 402, 430 (D.C. 2023) (quoting *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007)). This is a curious tack, as Ms. Ramey's counsel repeatedly represented

Accordingly, we decline to consider this argument on appeal. *See Rayner v. Yale Steam Laundry Condo. Assoc.*, 289 A.3d 387, 399 n.31 (D.C. 2023) (declining to address argument not raised before trial court as such arguments "are normally spurned on appeal" (quoting *Crockett v. Deutsche Bank Nat'l Tr.*, 16 A.3d 949, 953 (D.C. 2011))).

Even if Ms. Ramey had not waived this claim, she nonetheless fails to show that the final jury instructions constituted reversible error. When reviewing jury instructions, "'we must look at the instructions as a whole in assessing whether they constituted prejudicial error.'" *Chadbourne v. Kappaz*, 779 A.2d 293, 297 (D.C. 2001) (quoting *Hunt v. United States*, 729 A.2d 322, 325 (D.C. 1999)). "A trial court has broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Campbell-Crane & Assocs., Inc. v. Stamenkovic*, 44 A.3d 924, 934 (D.C. 2012) (quoting *E. Capitol View Cmty. Dev. Corp., Inc. v. Robinson*, 841 A.2d 1036, 1039 (D.C. 2008)). In order to hold that an error is harmless, the reviewing court must "be able to say with 'fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not

agreement to the jury instructions after working with the trial court and opposing counsel to draft them.

substantially swayed by the error.'" *Nelson v. McCreary*, 694 A.2d 897, 902 (D.C. 1997) (quoting *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 539 (D.C. 1991)).

Ms. Ramey argues that the discovery rule turns on "the reasonableness of the plaintiff's reliance upon [medical advice] under all of the circumstances." To be precise, *Brin* calls application of the discovery rule a "highly fact-bound [inquiry that] requires an evaluation of all of the plaintiff's circumstances." *Brin*, 902 A.2d at 795 (quoting *Diamond*, 680 A.2d at 372). The trial court never directed the jury to do anything other than conduct a factual assessment of Ms. Ramey's circumstances. Indeed, the trial court lifted nearly all of the legally significant language in the jury instructions directly from *Brin*. *Compare, e.g.*, Transcript of February 1, 2023, at 178, *Ramey v. Dunne*, No. 2019-5730 (D.C. Super Ct. 2023) ("For Ms. Ramey to have plausible cause, she would have to have received medical advice that specifically identifies the alleged wrongdoing of the defendants to be included among the reasonably possible causes of her maladies."), *with Brin*, 902 A.2d at 794 ("To expand briefly upon the phrase 'plausible cause,' we contemplate that the plaintiff will have received medical advice that specifically identifies the wrongdoing of the defendant to be included among the reasonably possible causes of her maladies . . . .").

Ms. Ramey argues that the trial court instructed the jury that appellees need only prove her receipt of any "medical opinion that the wrongdoing is a plausible cause of the known injuries" in order to "irrevocably" trigger the running of the statute of limitations. This concern is unfounded. As discussed *supra*, the factfinder is required to assess the factual circumstances when determining whether or not a legally sufficient medical opinion has been delivered. The jury instructions captured this inquiry: "[W]as the totality of Ms. Ramey's knowledge sufficient to put her on notice of her claim against the defendants[?]" Accordingly, the jury instructions fairly and accurately stated the applicable law and, therefore, did not constitute prejudicial error necessitating a new trial.

### c.    Defense Counsel's Statements Concerning the Standard for the Discovery Rule

We now assess whether the trial court erred in denying Ms. Ramey's motion for a new trial predicated upon appellees' misstatements of law during opening and closing arguments.

When reviewing claims of misstatements of law or improper argument, we "review the record for legal error or abuse of discretion by the trial judge." *Irick v. United States*, 565 A.2d 26, 33 (D.C. 1989). In so doing, we "first determine whether [counsel's] challenged comments were improper." *Gilliam v. United States*, 46 A.3d

360, 366 (D.C. 2012) (quoting *Najafi v. United States*, 886 A.2d 103, 107 (D.C. 2005)). If the comments were improper, we then assess them in context, considering "'the gravity of the misconduct, its relationship to [the ultimate legal question], the effect of any corrective action by the trial judge, and the strength of [the appellee's case].'" *Id.* (quoting *Irick*, 565 A.2d at 32). The determination of what, if any, remedial action is appropriate is committed to the trial court's discretion, and "we do not lightly overturn [such] discretionary rulings." *Bost v. United States*, 178 A.3d 1156, 1190 (D.C. 2018) (quoting *Simmons v. United States*, 940 A.2d 1014, 1024-25 (D.C. 2008)). When counsel objected to the comments at trial, we reverse only if there is showing that the statements resulted in substantial prejudice. *Gilliam*, 46 A.3d at 366.

Here, during opening arguments, Ms. Ramey's counsel first objected to appellees' counsel saying the cause of action accrued when Ms. Ramey was "aware of injury possibly caused by a physician's negligence." The trial court ultimately overruled the objection, but advised the jury that "statements of counsel are not evidence." To be clear, counsel's comment was not a correct statement of law as *Brin* requires a medical opinion that establishes a "plausible" or "reasonabl[y] possible" linkage between the injury and the defendant's conduct. *Brin*, 902 A.2d at 794. The statement was thus improper. However, the trial court quickly addressed the statement with an advisement to the jury. Ms. Ramey's counsel did not oppose

this proposed advisement. Additionally, as discussed *supra*, the jury instructions properly stated the applicable legal test. The effect of both the advisement to discount counsel's statement and the correct jury instructions was sufficient to counteract any harm caused by the improper statements. *See, e.g.*, *Porter v. United States*, 826 A.2d 398, 408 (D.C. 2003) ("[T]he trial court took strong corrective measures, expanding significantly the standard jury instruction on burden of proof in final instructions."). We therefore hold that this statement did not result in substantial prejudice.

Later in opening arguments, appellees' counsel said, "[w]hat you need is some evidence of improper care and opinion—any opinion of wrongdoing or a whiff of negligent conduct." Again, Ms. Ramey's counsel objected. During a bench conference, the trial court stated its disagreement with the appellees' characterization of the law and suggested that Ms. Ramey address the issue during closing arguments. The court did not provide any instruction to the jury following the objection. This second statement was improper for substantially the same reasons as the first one. It would have been best practice for the trial court to address the jury to mitigate the error. However, as was the case with the first improper statement, the final jury instructions directly addressed the sufficiency of the triggering medical opinion and, thus, spoke to the impropriety of the statement. Furthermore, the trial court had already advised the jury to discount appellees' first

misstatement of law. This corrective action was sufficient to prevent substantial prejudice accruing from the improper statement.

During closing arguments, appellees' counsel stated that the statute of limitations "starts with basically two things; some evidence of wrongdoing by Dr. Dunne and some injury from that wrongdoing." Ms. Ramey's counsel again objected that this was a misstatement of law. The trial court overruled the objection. The cause of action does indeed accrue when evidence of wrongdoing and an injury comes to light, but there must also be evidence of a cause in fact. *Brin*, 902 A.2d at 792. Appellees' counsel neglected to mention all three factors. However, it is clear from the record that appellees' counsel addressed the need to establish a causal nexus, telling the jury that "you need a wow moment. You need the actual diagnosis." Although the improper statement was not the paragon of clarity, appellees' counsel essentially corrected his own mistake. This significantly reduces the severity of the impropriety and precludes a holding that the statement constituted harmful error.

As the defense's closing argument continued, counsel made several statements similar to those made in opening. Ms. Ramey did not object to any of these statements. As with the statements made in opening, those made during closing were addressed by the trial court's legally sufficient jury instructions.

Because the trial court sufficiently addressed defense counsel's improper statements of law, we conclude that it did not err in denying Ms. Ramey's motion for a new trial on that basis.

### d.  Waiver of Inquiry Notice Argument

We conclude by determining whether the trial court erred when it denied Ms. Ramey's motion for a new trial based on appellees' invocation of inquiry notice.

To reiterate the standard of review for improper argument, we "review the record for legal error or abuse of discretion by the trial judge." *Irick*, 565 A.2d at 33.  Trial courts have "broad discretion" in limiting closing argument if such argument would "'misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury.'" *Washington Inv. Parts. of Delaware, LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 583 n.25 (D.C. 2011) (quoting *Smith v. United States*, 330 A.2d 519, 521 (D.C. 1974)).

We focus here on appellees' statements during rebuttal closing concerning inquiry notice.  A threshold issue is whether Ms. Ramey preserved the issue. Appellees assert that Ms. Ramey's counsel seemingly acquiesced to the trial court's suggestion that a clarifying statement to the jury was sufficient to cure any error. This is not so.   Rather, counsel for Ms. Ramey clearly articulated for the trial court

the view that appellees' counsel was raising a previously waived inquiry notice argument. The trial court then overruled the objection and indicated that it would address counsel's concerns via an instruction to the jury. As the trial court was aware of Ms. Ramey's objection and ruled on the issue, Ms. Ramey was not obligated to continue fighting the issue ad nauseam: "[O]ur precedents do not require counsel to press their positions until blue in the face . . . ." *Evans v. United States*, 304 A.3d 211, 222 (D.C. 2023). Appellees' argument that Ms. Ramey waived the argument by acceding to the trial court's ruling is thus unavailing.

The statements were manifestly concerned with what Ms. Ramey would have learned had she exercised reasonable diligence in acting on the information that was available to her: "So what happens is Ms. Ramey walks into the lawyer's office, brings her [medical] records . . . . The lawyer then goes out and . . . does [an] investigation. . . . So they investigate it . . . [and] the eureka moment . . . is from 2007 . . . ." In other words, counsel's statements charged Ms. Ramey with knowledge she did not have, but which she would have discovered through the exercise of reasonable diligence, thus triggering her obligation to investigate potential claims against appellees. This line of argument is a clear invocation of inquiry notice knowledge under the discovery rule. *See Brin*, 902 A.2d at 794 (A plaintiff is charged with inquiry notice when they know facts "sufficient to trigger the obligation to make a reasonable investigation into the possible existence of a

cause of action."). Appellees had waived this argument. These statements were fundamentally improper, as they invoked a legal trigger for the discovery rule that both parties had put aside for the entirety of the statute of limitations trial. Furthermore, counsel's improper statements bore directly on the ultimate legal question of when Ms. Ramey had knowledge sufficient to accrue a cause of action.

Given the impropriety of counsel's statement, it was incumbent upon the trial court to take strong corrective action. It appears that the trial court did not recognize the severity of the statement, so it is unsurprising that its prophylaxis was insufficient. After Ms. Ramey's objection, the trial court explained the jury's responsibility to "decide [ ] what Ms. Ramey knew of her injury, the cause of her injury and of some evidence of wrongdoing by the defendants." Although this explanation addresses the general discovery rule inquiry, it fails to clarify what the jury should have considered as knowledge sufficient to satisfy the test. Absent such clarification, the jury was apt to confuse whether a cause of action could accrue based upon Ms. Ramey's actual knowledge or her inquiry notice knowledge. Indeed, by merely pointing the jury to the basic elements of the discovery rule, the trial court may very well have created a permission structure for the jury to assume that inquiry notice was sufficient: if appellees' counsel saddled Ms. Ramey with

inquiry notice knowledge and the trial court did not outright reject that charge, then the jury may have assumed a finding of such knowledge was permissible.

The appropriate remedy would have been to strike defense counsel's statement and then clearly instruct the jury that inquiry notice arguments were unavailable and the statute of limitations could only be triggered by Ms. Ramey's actual knowledge. The trial court also had the discretion to grant Ms. Ramey a sur-rebuttal to further wipe away the taint of the improper statements.

The trial court's error in insufficiently remedying defense counsel's improper statement was undoubtedly harmful. We can say with fair assurance that allowing appellees' counsel's statement to go uncorrected and uncontested posed a fatal risk that the jury confused what constituted knowledge sufficient to satisfy the discovery rule. The jury's confusion was aggravated by the late hour in the trial at which the improper statement was made. *See Diaz v. United States*, 716 A.2d 173, 180 (D.C. 1998) (Improper comments made in closing "are looked upon with special disfavor [as the objecting party] has no opportunity to contest or clarify what the [commenting party] has said." (quoting *Coreas v. United States*, 565 A.2d 594, 605 (D.C. 1989))). Although defendants are generally afforded the last word, if a trial culminates with the presentation of an unrebutted new legal theory, that final remark is apt to weigh disproportionately on the jury's deliberations. This muddling of

issues indelibly tainted the jury's verdict. Accordingly, it is appropriate to remand the case for a new trial consistent with this opinion.

### III. Conclusion

For the foregoing reasons, we remand the case to the trial court for a new trial.

*So ordered.*